169 F.Supp. 769 (1958)
ASSOCIATED TRANSPORTS, INC., Plaintiff,
and
Ford Motor Company, Intervening Plaintiff,
v.
UNITED STATES of America, Defendant,
and
Interstate Commerce Commission et al., Intervening Defendants.
No. 10903(1).
United States District Court E. D. Missouri, E. D.
December 23, 1958.
*770 T. D. Drury, St. Louis, Mo., for plaintiff, Associated Transports, Inc.
John A. Moekle, Dearborn, Mich., for Ford Motor Co., intervening plaintiff.
Victor R. Hansen, Asst. Atty. Gen., Maurice A. Fitzgerald and James E. Kilday, Attorneys, Department of Justice, Washington, D. C., and Harry Richards, U. S. Atty., St. Louis, Mo., for the United States of America, defendant.
Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, and B. Franklin Taylor, Jr., Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for the Interstate Commerce Commission, intervening defendant.
Loyal G. Kaplan, Omaha, Neb., and Brainerd W. LaTourette and G. M. Rebman, St. Louis, Mo., for intervening defendant LeRoy L. Wade & Son, Inc.
Before VAN OOSTERHOUT, Circuit Judge, and MOORE and HARPER, District Judges.
MOORE, Chief Judge.
This is an action by Associated Transports, Inc., a common carrier, by motor vehicle, and Ford Motor Company to set aside and annul orders of the Interstate Commerce Commission dated November 17, 1955, and April 22, 1957. Jurisdiction is invoked under the Judicial Code of the United States, 28 U.S.C.A. §§ 1336, 1398, and the case was heard by a court composed of three judges pursuant to Sections 2284, 2321-2325, 28 U.S.C.A.
On January 27, 1954, Associated Transports, Inc., filed application under Section 207(a) of the Interstate Commerce Act (49 U.S.C.A. § 307(a)), seeking a certificate of public convenience and necessity authorizing operation in interstate commerce as a common carrier by motor vehicles, over irregular routes, of automobiles, trucks, chassis and automobile accessories, in initial movements by Truckaway method, from Kansas City and Claycomo, Missouri, to points in Iowa, Nebraska, and South Dakota. The purpose of securing these rights was to serve the Ford Motor Company's plants at the above two cities, and Ford Motor Company supported the application. A contract carrier by motor vehicle, Leroy Wade & Son, Inc., under contract with Ford Motor Company to provide service to part of this three-state area, filed a protest against the application.[1] The application was referred to an examiner who conducted a hearing at Kansas City, Missouri, on June 24, 1954. Subsequently, he issued his report recommending the *771 application be denied on a finding that the proposed operation was not required by the public convenience and necessity.
Associated and Ford filed exceptions to the recommended report and order, and after a consideration of the exceptions, the Commission, by Division 1, on November 17, 1955, filed its report and order which affirmed the examiner and denied the application. Included in this report was a statement, in reference to Claycomo, that no certificate would be issued because (at the time of the consideration) Ford's Claycomo plant was producing airplane parts and a definite date of change-over to motor vehicles had not been established. Basing their petition in part on an offer to establish the change-over date, Associated and Ford sought a reconsideration and further hearing which was denied by the Commission, April 23, 1956.
In October, 1956, Associated instituted the present action to which the United States and the Commission filed joint answer. Subsequently, Ford intervened as plaintiff. In February, 1957, the Commission, by its own motion, reopened the administrative proceeding for reconsideration and the Court action was stayed until a decision was rendered by the Commission.
On April 22, 1957, the entire Commission issued its report (Associated Transports, Inc., Extension-Kansas City, Mo., 71 M.C.C. 367) which reaffirmed the prior findings and conclusions of Division 1. The Commission noted that in similar cases it had stated that a shipper should have a right to obtain the service of a dependable motor carrier without the vagaries of negotiating with contract carriers. These cases were distinguished on their facts, and the merits of this distinction will be discussed later in this opinion. Associated and Ford then filed supplemental petitions to which the United States and the Commission filed joint answers and Wade joined as intervening defendant. Essentially, plaintiffs contend that the orders and decisions of the Commission of November 17, 1955 and April 22, 1957, were arbitrary and an abuse of discretion in that (a) they were based on erroneous findings of fact, (b) they were contrary to the intent of Congress as enacted in the National Transportation Policy, and (c) they were contrary to established precedents of the Commission.
In considering whether the Commission erred in its finding of fact, our inquiry is limited to a determination of whether the facts are supported by substantial evidence upon the record as a whole (e. g. Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456). Without an extended discussion of the record, we find there is substantial evidence to support the Commission's findings. We do make, however, particular reference to Associated's contention that the Commission erred in finding "(t)here is nothing of record upon which to base any finding as to the probable future need, if any, for service from Claycomo." Associated, supra, 368. Although, as we have stated, the contention is without merit, there is the related problem of the propriety of the Commission's subsequent refusal to reopen the proceeding for further evidence of Ford's future need for services from Claycomo. From the record, and from oral argument, it is apparent that the Commission's refusal was based on the facts that there was, at that time, no change-over in production from airplane parts to motor vehicles and the offer was nothing more than the forecasting of another speculative date for such change-over. Limiting our inquiry, as we must, to whether the Commission's refusal was an abuse of discretion (Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 517, 64 S.Ct. 1129, 88 L.Ed. 1420; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 534-535, 66 S.Ct. 687, 90 L.Ed. 821; Atchison, etc., Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273), we find the Commission properly exercised its discretion.
*772 Plaintiff's second contention that the Commission's order was contrary to the National Transportation Policy is based on an interpretation of that Policy by the Supreme Court in Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117. The statements by the Supreme Court relevant to the present case are:
"* * * the Commission cast its first principal conclusion in terms of the adequacy of existing rail service, finding that service to be `reasonably adequate' * * *. Of course, adequacy of rail service is a relevant consideration, but as the Commission recognized in A. J. Metler Extension-Crude Sulphur, 62 M.C.C. 143 [148] `relative or comparative adequacy' of the existing service is the significant consideration when the interests of competition are being reconciled with the policy of maintaining a sound transportation system. The record here does not disclose the factors the Commission compared in concluding that existing rail service is `reasonably adequate.' For example, the Commission has not determined whether there are benefits that motor service would provide which are not now being provided by rail carriers, whether certification of a motor carrier would be `unduly prejudicial' to the existing carriers, and whether on balance the public interest would be better served by additional competitive service." Id., 355 U.S. at page 90, 78 S.Ct. at page 177.
Although the present case involves motor carriers only, we think the above statement requires a determination of whether the Commission has explained the reasons for its judgments in sufficient enough detail to show that it did evaluate the entire situation.
In its order of Nov. 17, 1955, the Commission stated:
"We have consistently held that existing motor carriers should be accorded the right to transport all traffic which, under normal conditions, they can handle adequately, efficiently and economically in the territory served them, before a new operator is permitted to enter the field in competition with them. The evidence is not convincing that the presently authorized carriers are unable to provide reasonably adequate and dependable service to meet the needs of Ford from Kansas City and Claycomo to the three States named in this application. In the circumstances, the application will be denied."
It would appear that the Commission did base its judgment solely on the adequacy of the established service.
However, on reconsideration, the Commission made a detailed finding that Wade's business was largely derived from Ford, that Ford helped establish Wade in business, and that the granting of the proposed certificate would cause the diversion of a substantial amount of traffic from Wade. Associated Transports, Inc., supra, 369-370. Furthermore, the Commission distinguished prior cases which granted certificates to common carriers in the face of existing contract carriers, and, in so doing evaluated the inherent advantages of a common carrier in the present circumstances. Id., at 369. Consequently, it is apparent that the Commission did not base its orders solely on the adequacy of the existing service, but rather, pursuant to the mandate of the Schaffer case, it did balance the advantages of and the needs for the proposed carrier service against the impairment to the existing carrier service.
A more serious issue is raised by the contention that the Commission's orders are contrary to its own established precedents which, plaintiffs contend, entitle Ford to common carrier service. The Commission has stated, quite often, that "it is well settled that a shipper is entitled to dependable motor carrier service which is not subject to the contingency of negotiating a satisfactory agreement for contract carriage or the burden *773 of assuming the obligations of such a relationship." J. M. Rayfield Contract Carrier Application, 21 M.C.C. 214, 215; see, also, William S. Clark, Extension-Ohio, 69 M.C.C. 595, 598; Quality Milk Service, Inc., Extension-Molasses, 64 M. C.C. 5, 7; Rogers Cartage Company, Extension-Wisconsin, 47 M.C.C. 813, 6 F.C. C. 273, 274; Northern Truck Line, Inc., Extension of Operations-Wyoming, 28 M. C.C. 200, 202; In the light of this statement, it does seem inconsistent for the Commission to deny Associate's application and, thereby, deny Ford the right to obtain the service of a common carrier. But statements out of their factual context cannot be explained sensibly. Particularly is this true in reference to statements and conclusions of administrative agencies whose basic purpose flexibilitywill, at times, preclude an attack on findings because of alleged inconsistencies (e. g. Georgia Public Service Commission v. United States, 283 U. S. 765, 775, 51 S.Ct. 619, 75 L.Ed. 1397; see also, Anderson Motor Service v. United States, D.C.E.D.Mo., 151 F.Supp. 577, 581-582, and cases cited therein). In the present case, the Commission, on reconsideration, explained the seeming inconsistency by distinguishing prior cases, on their facts, in the following manner:
"(In the prior cases) it was found that the proposed service would not divert traffic from existing contract carriers. In none of these cases did the contract carriers have effective contracts with the supporting shippers. In our opinion, a contract carrier which has served the shipper for some time under a contract still in effect and which stands to lose some of the traffic which it has enjoyed has a more real interest than a carrier which merely hopes to be able to negotiate a contract, with a possibly unwilling shipper, and thereby obtain additional traffic." Associated, supra, at 369.
We agree with the Commission that the present case is not so similar to prior cases that their findings are inconsistent. As noted, in none of the cited cases was there an existing contract between the shipper and the contract carrier. This fact was of some importance because in most instances the shipper was unwilling to enter into contracts for carriage (Rogers, Clark, and Quality, supra). For specific example, in the Quality case the shipper did not want to negotiate with the contract carrier because "* * * vehicles of the present contract carrier (had) the name of the shipper's competitor painted on the sides of the equipment". Quality, supra, at 7. Thus, where a need for additional carrier was found, it was reasonable to seek a common carrier rather than a contract carrier. Ford's admitted willingness to keep using Wade places them in an entirely different position from that of the parties in the prior cases.
The second fact difference important enough to consider is that a grant of the application would result in a substantial diversion of traffic from Wade. Both in Rayfield (1. c. 215) and Quality (1. c. 7) the Commission prefaced its statement that a shipper is entitled to common carrier service with a specific finding that the common carrier would not divert traffic from the contract carrier. It would appear, from a reading of the other cited cases, that in those cases, also, no such diversion would occur. Along with this, it should also be pointed out that Ford's contention that it should not suffer the vagaries of negotiating with a contract carrier has little substance. The present contract carrier, Wade, because of its great dependence on Ford does not have a strong bargaining position and would not, rationally, refuse reasonable offers. It would seem that Ford is not really seeking to avoid contract negotiations by requesting common carrier service but is, in effect, just requesting another carrier, for which the Commission has, properly, found no need. Although one facet of the National Transportation Policy is to protect common carriers, it does not follow that the Policy encompasses an unnecessary expansion of a common carrier at great expense to existing contract carriers.
*774 We find the combination of the above factors sufficiently explains why the shipper was entitled to common carrier service in prior cases and not so entitled in the present case.
A judgment will be entered dismissing the Complaint.
NOTES
[1] Throughout the rest of this opinion, the parties will be referred to as follows: Associated Transports, Inc. "Associated"; Ford Motor Company "Ford"; Leroy L. Wade & Son, Inc. "Wade".