BURLINGTON TRUCK LINES, INC., a Corporation, Plaintiff,

v.

INTERSTATE COMMERCE COMMISSION
and
United States of America, Defendants,
and
Santa Fe Trail Transportation Company et al., Plaintiffs-Interveners.

Civ. No. P–2306.

United States District Court
S. D. Illinois, N. D.
April 27, 1961.

Mercer, Chief Judge, dissented.

David Axelrod, Axelrod, Goodman & Steiner, Chicago, Ill., for plaintiff and plaintiffs-interveners.

James A. Gillen, Russell B. James, Chicago, Ill., for plaintiff Burlington Truck Lines, Inc.

Starr Thomas, Roland J. Lehman, Chicago, Ill., for plaintiff-intervener Santa Fe Trail Transp. Co.

Robert W. Ginnane, Gen. Counsel, I. K. Hay, Associate Gen. Counsel, I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., for defendant United States.

J. Max Harding, Duane W. Acklie, Nelson, Harding & Acklie, Lincoln, Neb., James S. Dixon, Peoria, Ill., for defendant-intervener Nebraska Short Line Carriers, Inc.

David D. Weinberg, Arnold J. Stern, Omaha, Neb., Lowell R. McConnell, Peoria, Ill., for plaintiff-intervener General Drivers & Helpers Union, Local 554.

Before MAJOR, Circuit Judge, MERCER, Chief Judge, and POOS, District Judge.

POOS, District Judge.

Burlington Truck Lines, Inc., a corporation, plaintiff, filed its complaint seeking injunctive relief against Interstate Commerce Commission and the United States to restrain the enforcement of the orders of Interstate Commerce Commission granting a limited certificate of convenience and necessity to Nebraska Short Line Carriers, Inc., in the Commission proceedings entitled, "Nebraska Short Line Carriers, Inc., Common Carrier Application, Docket No. MC–116067."

Jurisdiction is authorized by Title 28 U.S.C. §§ 1336, 1398, 2284, and 2321 through 2325, inclusive, all of which authorize interested parties to seek relief from a three-judge United States District Court.

The intervening plaintiffs are Santa Fe Trail Transportation Company, Watson Bros. Transportation Co., Inc., Red Ball Transfer Co., Interstate Motor Freight System, Inc., Independent Truckers, Inc., Illinois-California Express, Inc., Interstate Motor Lines, Inc., Navajo Freight Lines, Inc., Ringsby Truck Lines, Inc., and General Drivers and Helpers Union, Local 554, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The effect of the pleadings of interveners is to adopt the allegations and theory of the plaintiff's complaint.

Plaintiff, and all interveners, except the labor union, are common carriers by motor vehicle in interstate commerce and subject to the Interstate Commerce Act. Plaintiff is authorized to engage in transportation of general commodities to, from and between points in Colorado, Illinois, Indiana, Iowa, Kansas, Missouri, Montana, Nebraska and Wyoming, pursuant to a "Certificate of Public Convenience and Necessity," issued to it by the Interstate Commerce Commission. Its residence and principal offices are located in Galesburg, Knox County, Illinois. Watson Bros. Transportation Company, Inc., The Red Ball Transfer Co., Interstate Motor Freight System, Inc., Independent Truckers, Inc., Illinois-California Express, Inc., Interstate Motor Lines, Inc., Navajo Freight Lines, Inc., and Ringsby Truck Lines, Inc., are likewise common carriers and are authorized to do business by virtue of "Certificates of Convenience and Necessity," issued by Interstate Commerce Commission to them in various proceedings and orders of the Commission. Their operations cover the States of Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, Utah, Virginia, West Virginia, Wisconsin and Wyoming, and the various business offices of these motor carriers are located at Denver, Colorado, Grand Rapids, Michigan, Omaha, Nebraska, and Salt Lake City, Utah. The application of Nebraska Short Line Carriers was opposed before the Commission by eighteen motor and rail carriers, and the intervening plaintiffs were included. All class rail carriers in western trunkline territory likewise opposed the application, as did the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Local No. 554 thereof.

The complaint alleges that Nebraska Short Line Carriers, Inc., by application filed June 22, 1956, Docket No. MC-116067, sought authority from the Commission to conduct operations as a common carrier in interstate and foreign commerce in the transportation of general commodities, with certain exceptions over irregular routes, between Denver, Colorado and Chicago, Illinois; between Omaha, Nebraska and Chicago, Illinois; between Minneapolis, Minnesota and Des Moines, Iowa; between Council Bluffs, Iowa and St. Louis, Missouri; and between Lincoln, Nebraska and St. Joseph, Missouri, serving intermediate and off route points on said routes; and that by application filed January 10, 1957, Docket No. MC-116067, (Sub-No. 2), sought authority to operate as a common interstate and foreign motor carrier in the transportation of general commodities, with certain exceptions over irregular routes between Omaha, Nebraska, on the one hand, and, on the other, points in Arizona, Arkansas, California, Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin and Wyoming; that in Case No. MC-116067, the hearing examiner by proposed order served September 3, 1957, recommended to the Commission that the application be denied because Nebraska Short Line Carriers had failed to prove public convenience and necessity, and for

the same reason by proposed order served August 8, 1957, in Case No. MC–116067, (Sub-No. 2) recommended that the application be denied; the Commission by order dated June 1, 1959 consolidated both cases and granted authority to applicant to operate as a common carrier by motor vehicle in the transportation of general commodities with certain exceptions over regular route between Omaha, Nebraska and Chicago, Illinois, and between Omaha, Nebraska, and St. Louis, Missouri, serving the intermediate points of Kansas City, Missouri, restricted in each instance to traffic originating at or destined to points in Nebraska, but denied the other application for additional rights; that by order dated March 10, 1960, the Commission denied the petitions for reconsideration and/or further hearing as filed by certain protesting carriers including the petition for reconsideration of plaintiff filed on July 27, 1959; and the complaint further alleges that the decision of the Commission is contrary to law for the same fourteen reasons, which, on analysis, challenge the jurisdiction of the Interstate Commerce Commission to enter the order in question under the law and the evidence.

The relief prayed is for entry of a decree adjudging the orders of Interstate Commerce Commission entered June 1, 1959, and March 10, 1960, to have been entered in violation of the Interstate Commerce Act, and therefore unlawful, null and void, and for such other relief as the court deems meet. The intervening motor carriers adopted the allegations of the complaint. Intervening plaintiff, The General Drivers and Helpers Union, Local 554, allege substantially the same matters as plaintiff, and alleged in addition that the basis for the application of Nebraska Short Line Carriers, Inc., was a desire to protect itself from the so-called "hot-cargo clause" provision of the labor contract entered into by the Union, plaintiff and intervening plaintiffs' carriers.

The defendants and intervening defendant, Nebraska Short Line Carriers, Inc., filed answers to the complaint, inter-vening carriers' complaints, and to the intervening complaint of Local 554, in and by which all factual allegations were denied and refer to and adopt the record of Interstate Commerce Commission for the complete and accurate facts and findings made by the Commission. They admit that the Commission does not have jurisdiction to consider the legality or propriety of agreements between motor carriers and labor organizations affecting labor relations between employers and employees, or to adjudicate labor disputes or controversies, but allege that the Commission, under the provisions of the Interstate Commerce Act, is concerned with, and has jurisdiction over the actions of common carriers in relation to their obligations to the public under said Act, and where, as here, the existing carriers are shown to have so conducted their operations as to result in serious inadequacies in the service available to a large section of the public, the Commission is empowered and charged with the duty of procuring such additional facilities by the grant of motor carrier authority as may be necessary to carry out the purposes of the National transportation policy; and admit that the Interstate Commerce Act does not contemplate or provide for issue of certificates of public convenience and necessity as a penalty, but say that the Act does provide for the issuances of certificates when the Commission finds that the service is, or will be required by the present or future convenience and necessity as provided in the Act; and further allege that the evidence adduced before the Commission, and here under review, established that the present and future convenience and necessity required operation by the applicant of a common motor carrier service between the points and to the extent set forth by the order of the Commission entered in this proceedings; refer the court to the Commission's report and order of June 1, 1959, for the complete and accurate reasons and basis for the grant of the certificate in question; and lastly, they say that the challenged orders of the Commission are lawful and in all respects

valid and seek a decree that the relief prayed be denied, and the complaint and intervening complaints be dismissed.

All parties hereto agree to the findings of fact, one side of the litigants affirming these facts as justifying the orders, while the other deny that they do.

We are thus required to examine the facts and inquire, under those facts, whether or not there are substantial facts to either affirm or reject the respective orders under the applicable rules of law pertaining thereto.

The allegations of the complaint on which the plaintiff bases its right to relief, all adopted by the intervening plaintiffs, while stated in some fourteen allegations, when analyzed can be stated as based on one general proposition, namely, the questioned authority of the Commission to issue the Certificate granted under the Commission's statutory power. All other asserted propositions are urged as a basis for the denial of this power.

■ We are presented at the outset with the scope of judicial review of orders of the Interstate Commerce Commission. The Supreme Court, in a long line of decisions, has consistently held that orders of the Commission should not be set aside, modified or disturbed by a court on review, if they lie within the scope of the Commission's statutory authority, and are based upon adequate findings and are supported by substantial evidence, even though the court might reach a different conclusion on the facts presented.

This principle is clearly enunciated in Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U.S. 541, 547–548, 32 S.Ct. 108, 110, 56 L.Ed. 308, 311, wherein the Court said:

"There has been no attempt to make an exhaustive statement of the principle involved, but in cases thus far decided, it has been settled that the orders of the Commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow determines the validity of the exercise of the power (citing cases).

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Ill. Cent. [R. Co.] v. I. C. C., 206 U.S. 441 [27 S.Ct. 700, 51 L.Ed. 1128]. Its conclusion, of course, is subject to review, but when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

■■ The general rule is that "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260;

Rochester Telephone Corporation v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147. The Commission's judgment is to be exercised in the light of each individual case. The courts are not concerned with the correctness of the Commission's reasoning or with the consistency or inconsistency of decisions which it has rendered. Virginian Ry. Co. v. United States, 272 U.S. 658, 663–666, 47 S.Ct. 222, 71 L.Ed. 463; Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941.

In Virginian Ry. Co. v. United States, 272 U.S. 658, at pages 665–666, 47 S.Ct. 222, at page 225, the court said:

"* * * This court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it."

■ Unless there is clear evidence to the contrary, it must be presumed that the Commission has properly performed its official duties; and this presumption supports its official acts. United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131; Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333.

The National Transportation Policy of Sept. 18, 1940 (49 U.S.C.A. preceding Sections 1, 301, 901, and 1001), provides:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve, the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences, or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, co-ordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

Section 207(a) of the Interstate Commerce Act (49 U.S.C.A. § 307(a) provides in part as follows:

"Subject to section 210, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this part and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied * * *"

The admitted facts establish that Nebraska Short Line Carriers, Inc., is a corporation organized under Nebraska law on June 14, 1956, with authority to issue 1,000 shares of common and 500 shares of preferred stock at $100 per share; that at hearing time $37,500 of common stock had been issued and held in varying amounts by Romans Motor Freight and other Nebraska intrastate carriers, the officers and owners of which were experienced men and companies in

the transportation business of motor common carriers, and all of whom had certificates of convenience and necessity, either from the Nebraska State Railway Commission for intrastate Commerce or from Interstate Commerce Commission for interstate traffic movements. All carriers and individual owners holding stock in Nebraska Short Line Carriers, Inc., are non-union motor carriers and operate wholly within certain points in Nebraska. The Nebraska Intrastate carriers are Romans Motor Freight, Clark Bros. Transfer, Lyon Transfer, McKay Freight Line, Winter Bros., Abler Transfer, Inc., Fremont Express Co., Superior Transfer, Pawnee Transfer, Derickson Transfer, Steffy's Transfer, Crete and Wilber Freight Lines, and Tillman Transfer Company. The President of applicant is John Romans, the Vice-President is C. C. McKay, the Secretary, Walter F. Clark, and the Treasurer, Royal F. Lyon, and who, with Leonard Abler, constitute the Board of Directors. Most of the stockholding truckers are authorized to transport general commodities with exceptions between certain points in eastern and central Nebraska, including Omaha and Lincoln, and between Grand Island and North Platte. Collectively they operate numerous vehicles, some of which are suitable for transporting commodities requiring refrigeration. The traffic manager was able to secure terminal facilities at Chicago, St. Louis, Kansas City, Minneapolis and Denver, and found that drivers and plenty of motor vehicles could be procured for the transportation of dry and refrigerated freight. Initially, applicant proposes to lease equipment from its stockholders or other motor carriers. The applicant, if granted authority, proposes to serve the public generally and its general manager indicated that no discrimination would be shown in selecting carriers for traffic interchange.

On January 26, 1957, applicant had total assets of $32,785; liabilities of $467; and net worth of $32,318. By order entered Dec. 4, 1956, temporary authority to applicant was approved upon meeting certain requirements.

In May, 1956, the stockholders, under their carrier rights, began to experience difficulties at Omaha, Lincoln and Grand Island, Nebraska, in respect to interstate traffic normally interchanged at those points with certain motor carriers. Romans was informed in Omaha, by an official of Independent, that the latter carrier was risking labor trouble with its employees, who are members of Teamsters' Union, if normal interchange between these carriers was continued, and it did not desire to handle freight moving from or to Romans' line. Certain shipments tendered by Romans to Watson at Omaha on May 10, 1956, were not accepted by that carrier. These shipments were accepted finally by Independent. Although Independent occasionally takes shipments from Romans, it did not do so in every instance. Romans is not given any traffic by Independent destined to the points he serves. Similar interchange difficulty has been experienced at Grand Island, particularly with Red Ball and Watson. Time is consumed in finding motor carriers willing to accept traffic, and Romans' operations are otherwise disrupted by an abnormal number of requests from consignors to trace shipments.

Certain motor carriers, particularly Burlington and Santa Fe Trail, continue to interchange freight with Romans whenever shipments are tendered. Romans has through rates with Burlington to all points in the application, and had this arrangement prior to May 7, 1956. Tenders of interstate shipments are made particularly to motor carriers other than Burlington and Santa Fe Trail to determine whether normal interchange has been resumed. Burlington has requested some shippers to route their traffic via Burlington and his line. He has interchanged freight on certain occasions with Rock Island Motor, apparently without incident.

Romans' volume of interline interstate freight decreased in 1956 compared to 1955 volume. His gross revenue in 1956 was $138,775, as against $159,280 in 1955. Prior to May, 1956, 30 per cent

of his traffic consisted of outbound shipments, and 70 per cent was inbound. Presently most of his traffic consists of shipments moving out of the territory he serves, and over half the outbound shipments are routed.

Prior to May 7, 1956, Romans interchanged freight in Omaha with Brady, Burlington, Freightways, Independent, Prucka, taken over by Interstate Motor Freight System, Inc., Red Ball, Ringsby, Santa Fe Trail, Watson, Burlington-Chicago Cartage, Inc., Des Moines Transportation Company, Inc., Haeckl Express, Inc., Ideal Truck Line, Iowa-Nebraska Transportation Company, Inc., McMaken Transportation Company, Merchants Motor Freight, Inc., Revell Transit Lines, Roberts Transfer, Sturm Freightways, Trans-American Freight Lines, Inc., Wilson Freight Forwarding Company, Wright Motor Freight Lines, now B–C Cartage, D.M.T., Haeckl, Ideal I.N.T., McMaken, Merchants, Revell, Roberts, Sturm, Trans-American, Wilson and Wright, respectively. These were most of the major motor carriers with whom interchange was affected. After the approximate date of May 7, 1956, these truck lines would not tender or accept freight from Romans at certain times, and this has continued. Interchange between Romans and Burlington, Santa Fe Trail and Rock Island has continued. Ringsby has also accepted freight.

Romans is non-union. There have been no strikes by his employees, nor have any pickets been placed at his docks or terminals.

Abler's main office and terminal is located at Norfolk, Nebraska. It serves Sioux City, Iowa, as well as Omaha. No terminal facilities have been operated by this carrier at Sioux City since March 15, 1956, when certain unionized connecting carriers serving that point discontinued normal interchange operations with him. Shortly thereafter the discontinuance of normal interchange began at Omaha by most of the carriers with whom he interlined freight. Burlington and Santa Fe continued to interchange traffic and some shipments have been re-

ceived from Ringsby. Occasional shipments were interlined with Freightways and Sturm. In June, 1955, at both Sioux City and Omaha, he interchanged 400 shipments with Watson. This dropped to nothing in 1956. In June, 1955, at the same two points, he received from 300 to 500 shipments from Freightways, and in June, 1956, he interchanged about 5 shipments with this carrier. In the first nine months of 1956, his gross revenue, including interstate and intrastate was $70,000 less than that for the corresponding period of 1955. He was approached by union representatives, beginning in August, 1955, relative to signing a contract. He was advised by one union representative that a drive was on for memberships in Nebraska and that non-union motor carriers were being contacted.

McKay operates terminals at Omaha, Fairbury and Beatrice, Nebraska. It operates to and from about 45 points in Nebraska, some of which are not served by any other regular route motor carrier. Service is rendered daily out of Omaha and Lincoln. On April 17, 1956, a large number of motor carriers discontinued normal interchange with him at Lincoln and Omaha. In 1955 at these points he received 1,215 interstate shipments by interline from other motor carriers, and in 1956 received only 210. Gross revenue of $205,000 in 1955 dropped to $156,000 in 1956. On some occasions his driver was permitted to pick up the necessary freight bills and shipments at certain connecting carriers' terminals. At other times he was not allowed to obtain the bills or the freight. Ringsby has accepted traffic from McKay since April, 1956, and Burlington and Sante Fe Trail have continued to interchange traffic at Omaha and Lincoln with him.

Wilber interchanges traffic at Omaha and Lincoln. Their annual gross revenue totals $60,000, and forty per cent is derived from interstate traffic, including shipments transported between Council Bluffs, Iowa and Crete, Nebraska.

Tillman operates between Fremont and Lincoln. In 1956, this carrier grossed

about $47,000. Ten per cent of it comes from interstate traffic. At Fremont it interchanges traffic with Abler and Brandt Transfer, and at Lincoln with Burlington, Red Ball and McKay.

Peters operates daily between Omaha and Fremont, and transports some interstate traffic between these points. At time of hearing he was still interchanging traffic with Prucka, Burlington and I.N.T. He still interchanges freight now and then with certain other motor carriers, but not as frequent as formerly. Merchants, for example, before April, 1956, gave him a substantial amount of traffic, but after that time very little. Also, certain traffic which he had received from Independent was given to Joe Ray Freight Line. Most of his present interstate traffic consists of shipments received in Omaha from National Car Loading Company for delivery to Fremont. He grossed about $20,800 in 1956, which compares favorably with other years, and about 85 per cent of this revenue was derived from interstate business.

Derickson operates daily over U. S. Route 30 between Grand Island and North Platte, and interlines traffic at those points with various motor carriers without difficulty. Numerous consignees route their traffic for ultimate delivery over his line. His competitors over this route consider his service adequate.

Steffy operates over routes between Omaha and Creston, Nebraska, and between Dodge, Nebraska and Sioux City, Iowa. Some of his points on and near Nebraska Highway 91, east of Creston, are not served by any other carrier. It interchanges traffic at Omaha with various motor carriers. Its profit in 1955 amounted to about $6,000.

Lyon operates daily between Omaha and numerous points in northeastern Nebraska, including Norfolk, Albion, Newman Grove, Madison, Columbus, Elgin, Neligh and Central City. He serves about 30 Nebraska points regularly and interchanges interstate traffic at Lincoln and Omaha. Most of his traffic is transported between Omaha and Columbus. Although Lyon operates over routes from Lincoln to Columbus, very little traffic is transported by him between those points. While he has been able to interchange with Burlington at Lincoln since September 1956, Red Ball has not interchanged shipments at that point. In February 1956, Lyon was approached by representatives of Teamsters Local No. 554 to sign a contract. He inquired whether the Union represented his employees. When informed they did not, he refused to sign a contract. Subsequent efforts were made by the Union to induce Lyon to sign a contract and when these attempts failed, normal interchange ceased at Omaha on March 21, 1956. Previous to that time Lyon had been interchanging traffic with numerous line-haul motor carriers, but after that only certain operators continued to interline shipments with him on a regular basis, viz., Box Truck Lines, Inc., Burlington, Ringsby, D.M.T., and National Carloading. Prucka tendered some freight to Lyon during the last week of January 1957. Certain of the carriers who no longer interchange with Lyon regularly, do accept occasional shipments, but there have been instances when Lyon has not been given freight by these carriers which was routed over his line. There have been no strikes or labor disputes on Lyon's line, and no pickets were established at his place of business.

Winter operates between Omaha and Lincoln. His interstate traffic is small.

Frear, under his Pawnee Transfer rights, can operate over regular routes between numerous points in southeastern Nebraska, including operations from Pawnee City to Lincoln, Lincoln to Beatrice, and Pawnee City to Omaha. Under his Superior Transfer rights he can operate over regular routes between various points in southeastern Nebraska, including operations between Superior and Hastings, Superior and Franklin, and Fairbury and Franklin. The Pawnee Transfer and Superior Transfer operations are not connected by any regular route, but these operations can be con-

nected by the use of certain irregular route authority.

Clark operates over regular routes between Omaha, Lincoln and Sioux City, Iowa, on the one hand, and on the other, numerous points in northeastern Nebraska, including Fremont, Norfolk, Neligh, Grand Island, Newman Grove and Madison. It serves about 85 points, and 12 of these have no regular route motor carrier service other than Clark. It interchanges most of its traffic at Omaha and some at Lincoln. About 90 per cent of its traffic is transported between Omaha and Norfolk. In 1955 Clark grossed $286,346; 40 per cent from interstate, and 60 per cent from intrastate traffic. In 1956 gross revenue was $217,412; 4 per cent from interstate and 96 per cent from intrastate. Prior to September, 1955, Clark conducted normal interchange with numerous motor carriers. Early in September, 1955, representatives of Teamsters, (Local No. 554), who claimed to represent Clark's employees, visited Norfolk to negotiate an agreement. Clark declined to sign a contract because the union desired to include the carrier's employees at Norfolk as well as those at Omaha. On or about September 17, 1955, a picket line was placed at Clark's Omaha terminal. Thereafter deliveries of interchange traffic to this terminal ceased generally. Clark did, where possible, deliver outbound interchange shipments to connecting carriers. On October 1, 1955, Clark decided to file charges of unfair labor practices against Teamsters with the National Labor Relations Board. This action culminated in a settlement agreement on December 7, 1955, by representatives of Local 554, Fred L. Clark, and a representative of N.L.R.B. The agreement was approved by the Regional Director of N.L.R.B. Among other things, the agreement provided for the posting of a notice at the business office of Local 554 at Omaha, which in effect stated that the Union would not induce or encourage employees of Santa Fe Trail, Red Ball, Merchants, Trans-American, D.M.T., Buckingham Transportation Company, Omaha Cold Storage Company or Sinclair Refining Company, or any other employer to engage in a strike or concerted refusal in the course of their employment, to handle or work on goods, articles, materials or commodities, or to perform services for their respective employers where an object thereof was to force or require said employers to cease doing business with Clark, or to force or require Clark to recognize or bargain with the Union as the collective bargaining representative in accordance with the provisions of Section 9, of N.L.R.B. Act, 29 U.S.C.A. § 159. This notice was placed also at various docks and terminals in Omaha. Thereafter, normal interchange with most motor carriers was resumed for a while until Clark's interline business dropped noticeably after January 10, 1956. However, from February through May, 1956, interchange was continued with Santa Fe Trail, Burlington and Wilson. Pickets, however, remained at Clark's terminal and were still there in March, 1956, including one of Clark's former employees (employed prior to September 14, 1955). No pickets have been placed at the Norfolk Terminal. Four of Clark's employees went on strike initially. On September 14, 1955, he had seven employees.

The Union activity was such that Clark sought relief from National Labor Relations Board, which Board applied for and obtained a temporary restraining order in United States District Court for Nebraska. The order of the Court, pending final determination of the matter before the Board, was calculated to enjoin picketing at the premises of various motor carriers and shippers who did business with Clark, and to restrain the commission of acts or conduct inducing or encouraging the employees of said carriers or shippers to engage in a strike or a concerted refusal in the course of their employment to use, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services where the object was to force or require said carriers or employers to cease doing business with

Clark or to force or require Clark to recognize or bargain with Teamsters or any other labor organization as the collective bargaining representative of any of Clark's employees unless and until the Teamsters, etc., was certified as the representative of said employees in accordance with Section 9 of National Labor Relations Act. Thereafter Clark tendered interstate shipments from time to time to certain motor carriers in Omaha. Specific instances were shown where D.M.T., Haeckl, Red Ball, Burlington and Buckingham Transportation did accept shipments in October, 1956. Since then tenders of interstate freight have been made to certain carriers and Clark found that the traffic was accepted in some instances and refused at other times. Seeking motor carriers to accept freight has resulted in delay, sometimes taking at least two days to dispose of shipments. On December 26, 1956, the N.L.R.B. in the proceedings involving Clark and the Union, entered an order requiring Teamsters Local No. 554 to cease and desist from certain unfair labor practices in violation of the National Labor Relations Act.

Generally the stockholders of applicant, with the exception of Clark, have had no dispute with their employees. They are parties to certain tariffs published by rate bureaus and have executed concurrences for the interchange of freight on through routes and through rates with various connecting motor carriers, including protesting motor carriers who are also parties to the published tariffs. They hold themselves out to transport interstate freight on a through route rate basis.

Shippers from some fourteen towns and cities in Nebraska supported the application. Shipments of drugs requiring expeditious delivery under refrigeration were delayed; rush order shipments of automotive parts were delayed. The same is true of clothing and drug shipments, butter shipments of the value of $18,000 to Chicago from a butter factory at Burwell, Nebraska, shipments of leather, newspapers, magazines, cata-

logues, advertising material, repair parts for farm machinery, truckload shipments of butter from Newman Grove, Nebraska, department store products, hardware store products and farm machinery parts from Sargent, Nebraska, hardware store supplies at Pierce, Nebraska, petroleum products, tires and accessories at Tilden, Nebraska, truck parts at Loup City, Nebraska, emergency shipments of auto parts at Neligh, Nebraska, tire shipments, seed, outboard motors, boats, marine hardware, plumbing fixtures, water softeners and related supplies, heating and air conditioning equipment, and dairy products from Kansas City, Chicago, Des Moines and St. Louis to Norfolk, Nebraska, raw materials for the manufacture of farm and industrial equipment, including corn cribs, grain bins, crop-drying machines and power steering devices from Kansas City, Denver, St. Louis, Minneapolis, Sterling and Chicago, Illinois and Hammond, Indiana, to Columbus, Nebraska, products for a chain organization located at Fairbury, Nebraska, receiving a wide range of commodities from Minneapolis, Chicago, Kansas City and St. Louis, wallpaper, floor coverings and other merchandise from St. Louis, Chicago, Lyons and Joliet, Illinois, Kansas City, Minneapolis, St. Paul and Des Moines, Iowa to Fairbury, Nebraska, pump jacks, cylinders, water supply equipment, windmills and plumbing supplies from various scattered centers over the middlewestern and Rocky Mountain states to Fairbury, Nebraska, drugs, department store commodities for Lincoln, Nebraska, heating and air conditioning equipment, various manufactured products, including frames for upholstered furniture, cabinets and television set bases, products for storage in two large warehouses, including products from large tobacco manufacturers and packing houses to, from and into Omaha from various centers over the country. The record is replete with delays, unnecessary tracing of shipments, inconveniences and losses, all because, as a former owner of Independent, testified that his Company, as a result of the fact that Romans was engaged in a labor dis-

pute over the employees refusal to be organized, was not in a position to order its employees to "either do business or not to do business" with Romans, and that "if the men chose not to do it, that was their own responsibility."

The record further shows that Omaha, with a 1950 population of 251,117, is both a railroad and trucking center. Ten rail systems and numerous truck lines operate through or to this centrally located city. All the rail carriers are more or less fully unionized, and all or nearly all the larger trucking companies are unionized under contracts with the Teamsters Union.

The Teamster contracts include what is known as a hot cargo clause, providing as follows:

"It shall not be a violation of this Agreement, and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from or to make pickups from, or deliveries to establishments where picket lines, strikes, walkouts, or lockouts exist.

"The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at any of whose terminals or places of business there is a controversy between such carrier or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled or used by interchanging or succeeding carriers, whether parties to this Agreement or not, until such controversy is settled.

"The Union agrees that, in the event the Employer becomes involved in a controversy with any other Union, the Union will do all in its power to help affect a fair settlement.

"The Union shall give the Employer notice of all strikes and/or the intent of the Union to call a strike of any Employer and/or place of business, and/or intent of the members to refuse to handle unfair goods. The carriers will be given an opportunity to deliver any and all freight in their physical possession at the time of the receipt of notice.

"Any freight received by a carrier up to midnight of the day of the notification shall be considered to be in his physical possession. However, freight in the possession of a connecting carrier shall not be considered to be in the physical possession of the delivering carrier.

"The insistence by any employer that his employee handle unfair goods, or go through a picket line after they have elected not to, and if such refusal has been approved in writing by the responsible officials of the Central States Drivers Council, shall be sufficient cause for an immediate strike of all such employer's operations without any need of the Union to go through the grievance procedure herein."

The plaintiffs and intervening plaintiffs' carriers are large trunk line carriers, carrying freight from the entire country to the port of Omaha, and receive and interchange freight at this location from smaller carriers who operate in eastern Nebraska, in joint tariff operations. These smaller carriers use Omaha as a principal or important interchange point, and carry outgoing freight from and deliver incoming freight to a very large number of Nebraska communities. Carriage by motor freight lines furnishes the transportation facilities

for most of these communities, and their normal existence depends on the uninterrupted flow of motor carriage of goods to their stores and factories. These Nebraska carriers, while smaller in the scope of their operations, adequately serve these Nebraska communities. These carriers are non-unionized.

As early as 1954, in some instances, and certainly by 1955, in most instances, the Teamsters Union began to show interest in these Nebraska carriers. Some, like Romans, were approached by labor representatives in 1954; some, like Clark, were contacted in 1955; and some, like Abler, were not approached until early 1956. The record shows that the Union was not very successful; that in most cases the employees did not respond, and that in every instance the carriers were more than reluctant to accept unionization.

The Union, having no satisfactory success in the Eastern Nebraska field, apparently and very probably started at the other end and began to work through the unionized carriers and put the pressure indirectly on the Eastern Nebraska carriers. The motives and intermediate steps are not matters of importance. The fact is that, by early 1956, all or most of these Nebraska carriers began to experience difficulties in receiving and delivering freight from and to most of their normal and logical connections at Omaha. To a smaller degree, the same difficulties were experienced at other points, such as Sioux City, Lincoln and Grand Island.

While some trunkline carriers did not freely admit that their interchange practices after May, 1956, had been materially different from earlier practices, some others freely admitted that they had not been able to interchange with Eastern Nebraska carriers in the same free and open way they interchanged prior to 1956. The preponderance of that evidence is to the effect that, in the case of most trunkline carriers, there was, after May, 1956, a deterioration in interchange relationships and a rise in interchange difficulties. These conclusions are heav-

ily confirmed by the testimony and exhibits shown in this record, and no one can seriously contend that the evidence of the Nebraska carriers was not founded on actual experience. The attitudes and interchange practices of the trunkline carriers were not uniform. Some carriers were more liberal than others, and the practices varied from almost free and open interchanges to very difficult interchanges. For instance, there is no doubt that some carriers, like Burlington Truck and Santa Fe, accepted almost all traffic offered. But even these carriers did not maintain the same free and open interchange practices in effect before May, 1956. In many or most instances, the interchanged traffic had to be handled at the terminal by officials or supervisory personnel, because the employees normally handling such traffic would not touch it. There is also the fact that these few more liberal carriers only reached relatively limited points and therefore could not normally provide acceptable service for much or most of the traffic which these Eastern Nebraska carriers would normally have handled.

The record shows beyond doubt that so far as those Eastern Nebraska carriers were concerned, the free and open interchange practices long in effect at Omaha were materially disrupted and made inconvenient, difficult, and inefficient by May, 1956. And there can be no doubt that, as a direct result, these Nebraska carriers suffered inconvenience, loss of business, and a deterioration of their service relations with their customers, thereby causing a breakdown of service to the public. These matters have been recited above showing inconveniences, delays, loss of interstate revenues, failure of adequate service to the public, etc., all assertedly because of union pressure.

The Nebraska carriers, faced with these problems, got together and formed applicant corporation. The principal purpose of this corporation is that, as a carrier based at Omaha, it could provide a reliable and dependable interchange service at Omaha and a trunkline service beyond. The applicant has no policy on

unionization, but it does have a firm policy to the effect that, under no conditions, would it ever agree to a union contract containing any hot cargo provisions.

The plea of plaintiff and intervening plaintiffs is that they have large investments in their operations, such as terminals, carriage equipment, and the like. There is likewise no doubt that their ability to perform service prior to May 1957 was adequate. The record shows that because of union pressure it was inadequate after that time, and they seek to justify it on the hot cargo clauses of their contracts with Teamsters Union. Essentially it sounds in confession and avoidance, basing their avoidance on a so-called hot cargo provision in a union contract. Nevertheless, from the examples cited in the record, Clark, in two years of operations, lost heavily. Its interstate traffic fell from 30 per cent of its total traffic in 1954, to 4 per cent in 1956. Two related shipper companies, referred to as Charadon, manufacture furniture. Sales are made in 29 states. Raw materials and supplies are received from one to several points in 23 states. The yearly volume averages 3 million pounds out, and 3.5 million pounds in. Truck service is used for 75 per cent of the outbound, and 40 to 50 per cent of the inbound. These companies had labor difficulties, and as a result had difficulty in getting trucking service for its in and out freight. These companies have been using applicant's temporary service. The Ford Storage and Moving Company and Ford Brothers have two warehouses at Omaha and one at Council Bluffs, Iowa. One principal function is to provide storage for all classes of merchandise. They normally have heavy movements of freight both in and out. From 1952 through 1956 the inbound volume ranged from the equivalent of 575 to 779 carloads. Inbound traffic originates at Chicago, Illinois; Durham, North Carolina; Cincinnati, Ohio; Sioux Falls, South Dakota; and Beloit, Wisconsin. Destinations of outbound traffic are principally Iowa, Kansas, Missouri, Illinois, Wisconsin, Minnesota, South Dakota, Wyoming and Colorado. On inbound traffic rail service has been heavily used, but there has been a growing tendency toward motor truck service. By early 1956, about 60 per cent of the volume was coming in by truck. On outbound traffic, truck service is more extensively used. Normally the shippers control inbound traffic and these companies control outbound traffic. Everything in transportation was all right there until early 1956, when the Teamsters Union began to take an active interest in their affairs. Service began to deteriorate. On February 9, 1956, one trucking company first accepted and then rejected a shipment from Ford, explaining that Union pressure was responsible. On May 24, 1956, pickets were stationed around the Ford warehouses. They were still there at the time of the hearing. After the pickets came, the service situation became desperate. Nearly all motor carriers were reluctant to service these warehouses, and some would not do business with these companies. In addition to the inconveniences and difficulties suffered by these companies, they have lost some of their volume of stored goods and have actually lost several accounts of long standing. All these transportation problems came directly or indirectly from labor difficulties with others, which Teamsters Union supported indirectly through refusal of their members who are employees of various trunk carriers to cross picket lines, although not involved in labor troubles with Truckers Union. These companies admit that prior to 1956, the truck service was satisfactory, but they support applicant with the hope and belief that applicant might solve their transportation problems. Even if the service of April 1956 were restored they would still favor applicant's service.

The Broyhill Company, operating a plant at Dakota City for the manufacture of farm equipment, also supported the applicant. Its gross sales in 1956 ran between seven and eight hundred thousand dollars, and greater anticipated sales in 1957. Raw materials come from a number of points spread throughout

20 states. Rail service is used rather extensively on the bulkier inbound commodities, but far less extensively on the outbound traffic. About 60 per cent of outbound traffic moves in truckload lots. About 80 per cent is routed by Broyhill. The trouble here started on March 14, 1957, when employee members of the steel union went on strike and set up picket lines. As a result of the picket lines there have been no pickup or delivery service at the plant since the line appeared. It admits that it had no transportation problem prior to March 14, 1957, and that its service has been generally satisfactory. It nevertheless supports this application upon the theory that there could be no guarantee that it would not have another strike.

These examples of shipper experience are cited to show that there were breakdowns in service because of the failure of trucking companies to serve the public through hot cargo clauses in their contracts. The trucking companies have no grievances with shippers, but because they have labor contracts with their own employees and the unions to which they belong, they take the attitude that their own labor relations should be first served to the damage and injury of the shipping public to which they owe an almost absolute duty to serve under their certificates of convenience and necessity as granted by the Interstate Commerce Commission.

There is no question about carriage by rail. It has always been adequate. The trunkline motor carriers, as a whole, have always been able to provide service to Omaha. Were it not for the effects of union pressure upon these carriers there would have been no material problem. The origin of the problem is in labor pressure. However this may be, these carriers owe a duty to the public to accept traffic irrespective of labor pressure.

The Commission found that applicant was organized as a means of combatting a labor situation arising in the Spring of 1956 which threatened to deprive the Nebraska carriers of much of the interstate traffic which they, before that date, had been handling, and in fact to drive them out of business entirely; that for several years the Nebraska carriers have resisted all attempts on the part of the Teamsters Union to organize their employees; that notwithstanding the almost complete lack, of any inclination on the part of their employees, for membership in the Union, the latter determined that such employees should be organized, and that they should be organized "from the top"; that is organizational effort should be concentrated upon the management of the carriers with a view toward the employees being blanketed into the Union by signing the carriers to a union-shop agreement. Having been unsuccessful in the attempt to obtain contracts from the carriers, the Union decided to bring economic pressure to enforce their demands. Their purpose was to accomplish their end by declaring Nebraska carriers "unfair", and the institution of a secondary boycott against their traffic on the part of the larger unionized carriers with which Nebraska carriers were dependent for the handling of interline traffic moving to and from points beyond Nebraska. The boycott was imposed pursuant to so-called "protection of rights", or "hot cargo" clauses contained in the labor contracts between the larger unionized carriers and affiliates of the Teamsters Union. Such clauses provide generally that it shall not be cause for discharge if any employee refuses to go through a picket line of a Union, or refuses to handle "unfair" goods; and that the Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is involved in any controversy with a union, and reserve the right to refuse to accept freight from or to make pickups from, or deliveries to, establishments where picket lines, strikes, walkouts, or lockouts exist. The clause is quoted above.

Also that applicant, irrespective of picket lines or other labor difficulties at plants and factories, proposes to render free and unrestricted interchange facili-

ties at all points served and to provide pickup and delivery service at the establishments of all shippers desiring service, regardless of picket lines.

The Commission found that at no time has the boycott against Nebraska Carriers been completely effective in that at no time has the interchange with the larger unionized carriers been completely shut off. For example, Burlington Truck Lines, and Sante Fe Trail Transportation Company, which are rail subsidiaries, appear to have accepted interline traffic from Nebraska carriers more or less regularly when offered, and to have generally maintained normal interline relationships with them. Certain others of the larger unionized carriers have accepted interline freight at times, and refused at other times. Most outbound interline traffic appears to have been disposed of by Nebraska carriers eventually, but the uncertainty of the situation has resulted in considerable harassment to the Nebraska carriers and substantial delays in the movement of freight. On inbound traffic, shipper routing instructions have been generally ignored, and much of the interline business previously enjoyed by certain Nebraska carriers and turned over to them for ultimate delivery to points on their lines, have been turned over to the railroads and non-scheduled motor carriers with resultant delays in delivery inconvenience and added expense to shippers. The latter stems from the fact that there are no joint rates published for motor-rail movements through Omaha. On the other hand, Nebraska carriers and the larger unionized motor carriers serving Omaha participate in tariffs naming through routes and joint rates on all motor traffic moving to and from Nebraska points through Omaha.

The examiner found that applicant had failed to establish that the proposed operation is required by the present or future public convenience and necessity, and recommended that the application be denied. In so doing, he suggested that an application for additional operating authority such as that here considered was not the proper vehicle for remedying the situation, and that the aggrieved stockholder-carriers and shippers should have filed a complaint with this Commission, the National Labor Relations Board, or the Courts. Applicant takes vigorous exception to such suggestion, urging that the difficulties experienced by the shippers or consignees at Nebraska points served by the stockholder-carriers as a result of the breakdown of normal interchange relations with the unionized carriers and the difficulties experienced by certain Omaha firms occasioned by the refusal of the unionized carriers to make pickups and deliveries at their establishments through peaceful union picket lines, amount to service deficiencies, and that the only practicable way to correct such deficiencies and assure adequate service in the circumstances here present is by the certification of an additional carrier which is willing to conduct free and unrestrained interline operations with the stockholder-carriers. It argues that the record clearly establishes the inadequacy of existing motor service for the movement of traffic to and from the establishments of a substantial portion of the shipping public of Nebraska, and that such established inadequacy compels the granting of the authority sought.

In their replies to the exceptions the opposing carriers and the Union argue generally that the conclusions of the examiner are in accordance with the law and the facts, and should be sustained. They urge (1) that applicant's proposal here is based entirely upon a labor situation and that the proper remedy for any grievances sustained by the stockholder-carriers or the shipping public resulting therefrom is the filing of a complaint with this Commission, the National Labor Relations Board, or the Courts, (2) that the labor controversies here involved are matters within the exclusive jurisdiction of the National Labor Relations Board, and that this Commission is without authority either to determine the merits of the labor questions presented, or to circumvent the questions by

the granting of additional authority such as here sought by applicant, and (3) that even under the circumstances presented, applicant has failed to establish a need on the part of the public for the additional motor carrier service proposed, and that it is fit and able properly to conduct an operation of the scope involved.

On June 1, 1959, the Commission, under the facts as herein set out, disagreed with the examiner's conclusions and found unanimously:

"In a situation as here presented, these arises a question as to the proper procedure to secure corrective action. We do not agree with those who insist that the procedure here adopted, * * * the filing of the instant application under the provisions of Section 207 of the Act, is in any manner inappropriate. Regardless of the injection of the labor situation into the matter, the instant applications are based upon claimed deficiencies in the motor service available to the shipping public of Nebraska. Where, as here, the existing carriers are shown to have so conducted their operations as to result in serious inadequacies in a service available to a large section of the public, one effective method of correcting the situation is by granting of authority for sufficient additional service, and, in fact, we are charged with the duty of procuring such additional facilities as may be necessary to carry out the purposes of the national transportation policy. The fact that other remedies are available, such as the suggested filing of complaints by the aggrieved carriers and shippers, does not alter the situation or deprive any carrier of the right to follow the course here chosen * * * that the present and future public convenience and necessity require operation by applicant in interstate or foreign commerce, as a common carrier by motor vehicle of general commodities, except those of unusual value, danger-ous explosives, and household goods as defined by the Commission, commodities in bulk, and those requiring special equipment, (1) between Omaha, Neb., and Chicago, Ill., * * * and return * * * and (2) between Omaha and St. Louis, Mo., from Omaha * * * to Kansas City, Mo. * * * to St. Louis, Mo., and return over the same route * * * serving the intermediate point of Kansas City * * * restricted in each instance, to traffic originating at or destined to points in Nebraska."

██ The Courts, in numerous decisions, have held that the Commission has a broad discretion in determining the issue of public convenience and necessity under Section 207(a) of the Interstate Commerce Act, and the pertinent portion of the order exercising this discretion has been quoted above. This issue is a matter requiring the exercise of the Commission's expert judgment in the field of transportation. New York Central Securities Corp. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 77 L.Ed. 138; United States v. Carolina Freight Carriers Corporation, 315 U.S. 475, 482, 490, 62 S.Ct. 722, 86 L.Ed. 971. In the exercise of this administrative function there are no specifications of consideration by which the Commission is to be governed in determining whether or not public convenience and necessity requires the inauguration of motor carrier service. We point out that this record shows, with abundant evidence, that a deficiency in service to the shipping public of Nebraska continued for over a period of two years because of transportation refusals, disregard of routings, routings by carrier and rail where no joint truck-rail rates were in existence, more expense to shippers, etc., all because of economic and labor pressure on the transportation companies involved. We also point out here that plaintiff, Burlington Truck Lines, Inc., and certain other transportation companies who continued to interchange and accept freight from the Nebraska carriers, will not be affected

by this order. Their business has continued, but because of the fact, either that their transportation facilities were unable to solve the problem when considered in the over-all picture, or because of the refusal of many other transportation companies to render the required service, caused the conditions to exist, is a matter for the Commission, in its discretion, to decide. These carriers have interchanged freight from and to Nebraska points during the entire period that applicant has served under its limited temporary authority, and it is reasonable to assume that such interchange will continue in the future. If it does not continue, and even though the resulting competition causes a decrease in revenue to some of the transportation companies, the privilege granted to operate truck lines is in no sense the grant of a monopoly. This is particularly emphasized under Section 207(b) (49 U.S.C.A. § 307 (b), which provides in substance that any certificate issued shall not confer any proprietary or property rights in the use of the public highways. There is no immunity against future competition. The record shows that the Commission considered the nature of the service rendered by plaintiff and Sante Fe during the period.

The plaintiffs argue that since Burlington and Santa Fe generally maintained normal interline relations during the period in question, and since some of the other plaintiff carriers accepted interline traffic at times, the Commission was not warranted in granting a certificate to the applicant. Although the Commission, in its report of June 1, 1959, in this proceeding (79 M.C.C. 599) took note of these facts, it nevertheless found that the public convenience and necessity required the operation of the applicant. Therefore, the Commission, in reaching its conclusions, took into consideration such service as those carriers continued to render during the period involved, but after weighing the evidence approved the application. Regarding this phase of the case, the Commission had this to say in its report (79 M.C.C. 599, 603):

"At no time has the boycott against the stockholder-carriers been completely effective in that at no time has interchange with the larger unionized carriers been completely shut off. For example, Burlington Truck Lines, Inc., and Santa Fe Trail Transportation Company, which are rail subsidiaries, appear to have accepted interline traffic from the stockholder-carriers more or less regularly when offered and to have generally maintained normal interline relationships with them. Certain other of the larger unionized carriers have accepted interline freight at times and refused at other times. Most outbound interline traffic appears to have been disposed of by the stockholder-carriers eventually, but the uncertainty of the situation has resulted in considerable harassment to the carriers and substantial delays in the movement of the freight. On inbound traffic, shipper routing instructions have been generally ignored, and much of the interline business previously enjoyed by certain of the stockholder-carriers has been lost. Inbound traffic normally turned over to the stockholder-carriers for ultimate delivery to points on their lines has been turned over to the railroads and non-scheduled motor carriers with resultant delays in delivery inconvenience, and added expense to shippers. The latter stems from the fact there are no joint rates published for motor-rail movements through Omaha. On the other hand, the stockholder-carriers and the larger unionized motor carriers serving Omaha participate in tariffs naming through routes and joint rates on all-motor traffic moving to and from Nebraska points through Omaha."

This is a finding of fact, with all other facts as hereinabove related, and as found by the Commission, constitute the basis on which the Commission entered its order.

■ The Commission is vested with administrative authority "to draw its conclusions from the infinite variety of circumstances which may occur in specific instances." This is necessarily true since it is the "present or future public convenience and necessity" which the Commission must determine. While it is difficult to forecast future needs, yet the best and safest assurance in all instances is to anticipate what they might be and attempt to meet them. In order to provide required transportation services as the demands arise, the Commission must exercise a prophetic vision. It cannot stand idly by and wait until the actual needs are present, but must foresee and take proper steps to meet them. Future need is an uncertainty in all instances. The best assurance of an accurate forecast is the considered judgment of the "tribunal appointed by law and informed by experience." Illinois Central R. R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128. The adequacy of the existing facilities is not the absolute criterion by which the Commission's action must be guided.

In Norfolk Southern Bus Corp. v. United States, D.C., 96 F.Supp. 756, 760, Judge Dobie said:

"There was no necessity for the Commission to make any specific finding concerning the inadequacy of the existing service. See Davidson Transfer & Storage Co. v. United States, D.C., 42 F.Supp. 215, affirmed 317 U.S. 587, 63 S.Ct. 31, 87 L.Ed. 481; A. B. & C. Motor Transp. Co. v. U. S., D.C., 69 F.Supp. 166, 169. Section 207(b) of the Interstate Commerce Act, 49 U.S.C.A. 307(b) states: 'No certificate issued under this chapter shall confer any proprietary or property rights in the use of the public highways.'

"Competition among public carriers may be in the public interest and the carrier first in business has no immunity against future competition. See Chesapeake & Ohio Ry. Co. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824; North Coast Transp. Co. v. United States, D.C., 54 F.Supp. 448, 451, affirmed 323 U.S. 668, 65 S.Ct. 62, 89 L.Ed. 543. Even though the resulting competition causes a decrease of revenue from one of the carriers, the public convenience and necessity may be served by the issuance of a certificate to a new competitor. Lang Transp. Corp. v. United States, D.C., 75 F.Supp. 915, 929; Inland Motor Freight Lines v. United States, D.C., 36 F.Supp. 885.

"As circuit Judge Parker stated in Beard-Laney v. United States, D.C., 83 F.Supp. 27, 32, affirmed 338 U.S. 803, 70 S.Ct. 64 [94 L.Ed. 486]: 'It is for the Commission, not the Court, to say what public convenience and necessity requires and whether these will be better served by licensing an additional carrier than by permitting those already licensed to expand their facilities.' "

■ Moreover, in determining the question of public convenience and necessity the responsibility is that of the Commission and not that of the hearing examiner. Thus, the recommended finding of the hearing examiner that the application should be denied is not binding on the Commission. Federal Radio Comm. v. Nelson Bros. Bond & Mtg. Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166; Interstate Commerce Commission v. Martin Bros. Box Co., 9 Cir., 219 F.2d 811, 812, certiorari denied 350 U.S. 823, 76 S.Ct. 50, 100 L.Ed. 735; Carolina Scenic Coach Lines v. United States, D.C., 56 F.Supp. 801, 805, affirmed 323 U.S. 678, 65 S.Ct. 277, 89 L.Ed. 550; C. E. Hall & Sons v. United States, D.C., 88 F.Supp. 596, 598; Inter-City Transp. Co. v. United States, D.C., 89 F.Supp. 441, 445; Norfolk Southern Bus Corp. v. United States, D.C., 96 F.Supp. 756, 758, affirmed 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590; Illinois California Express, Inc. et al. v. United States, 12 Fed.Carr. Cas., par. 81, 183. Under the Interstate Commerce Act, the final grant or denial

of applications for operating authority is to be determined by the Commission, not by the hearing examiner.

Plaintiffs allege in their complaints "that Nebraska Short Line Carriers, Inc., failed to prove or establish by clear and convincing evidence that the public could not be or was not being served adequately by existing carriers." Plaintiffs also allege "that the decision of the Interstate Commerce Commission is based solely and entirely upon allegations that certain shippers were unable to obtain transportation services from some carriers * * * during the period in question."

Complainants' attack in this regard appears to be directed primarily at the conclusion reached by the Commission upon the evidence. In other words, it seems that the complainants feel that the Court should weigh the evidence and reach a different conclusion from that reached by the Commission.

█ The considerations of the weight and value of the evidence and the inferences to be drawn therefrom are matters for the Commission alone to decide. Alton R. Co. v. United States, 315 U.S. 15, 23, 62 S.Ct. 432, 86 L.Ed. 586; United States v. Pan American Petroleum Corp., 304 U.S. 156, 158, 58 S.Ct. 771, 82 L.Ed. 1262; United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38; United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821.

In Riss and Co., Inc. v. United States, D.C., 100 F.Supp. 468, at page 483, affirmed 342 U.S. 937, 72 S.Ct. 559, 96 L.Ed. 697, rehearing denied 343 U.S. 937, 72 S.Ct. 769, 96 L.Ed. 1344, the lower court said:

"The Commission is the fact-finding body. The court does not make findings of fact, but simply determines whether or not the Commission's findings are supported by substantial evidence. Although the Court and the Commission might differ with respect to the weight of the evidence, or what the evidence

reveals, yet that does not give the Court the right to decide whether or not the Commission is mistaken in its findings, if there is substantial evidence upon which to base those findings. In reviewing the evidence there may be instances where our finding would be different from that of the Commission, but we have no authority to substitute our opinion for that of the Commission, any more than an appellate court has the right to substitute its views as to the facts for that of a trial court or jury."

In Virginian Ry. Co. v. United States, 272 U.S. 658, 663, 665–666, 47 S.Ct. 222, 224, 71 L.Ed. 463, the Supreme Court said:

"* * * To consider the weight of the evidence before the Commission, the soundness of the reasoning by which its conclusions were reached, or whether the findings are consistent with those made by it in other cases, is beyond our province * * * This court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it * *."

The issue before the Court is simply whether there is rational basis for the Commission's findings. It is not whether this Court may have reached different findings on the record made.

The hearing before the Commission consumed 19 days. The transcript of the evidence from the 75 witnesses who gave testimony consists of 2,886 pages, and there are about 175 exhibits, and we have read and studied the examiner's reports in which the evidence has been detailed and which both sides of this litigation concede to be fairly and accurately stated and from which the Commission found that there was no serious dispute as to the facts.

In the two cases pointed out by plaintiff, namely, Filson v. Interstate Commerce Commission et al., D.C., 182 F.

Supp. 675, and Hudson Transit Lines, Inc., v. United States, D.C., 82 F.Supp. 153, 157, affirmed 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485, as sustaining its position and contentions for reversal of the Commission's order, it is pertinent to point out that both cases sustained the orders of the Commission, refusing to grant authorization for the new service. In these cases the Commission, under the evidence, found that the existing service was adequate and refused to grant the applications sought, because of failure of proof that public convenience and necessity required the new service and failed to show inadequacy of the existing service. In the latter case the Court does point out that "inadequacy of existing facilities as a basic ingredient in the determination of public 'necessity' ", and it does not mean "that the holder of a certificate is entitled to immunity from competition under any and all circumstances", and that the "introduction of a competitive service may be in the public interest where it will secure the benefits of an improved service without being unduly prejudicial to the existing service."

In the opinion of this Court, we find and hold that the order of the Commission is supported by substantial evidence that the service of the existing carriers, under the circumstances here involved, was inadequate, and that the proof in the record shows that the competitive service as here granted is in the public interest.

█ Another question argued in support of the complaint is that there was a labor dispute which the Commission had no power to adjudicate, the plaintiff asserting that the matter should be presented to the National Labor Relations Board, under the provisions of the National Labor Relations Act. There is no labor dispute between any employer or employee here. The only labor dispute of which the National Labor Relations Board had jurisdiction to assume was that of Clark, and he did take his matter before that Board and had it adjudicated. As a result of his efforts the Board sought and procured injunctive relief in

his behalf. It is rather pressure brought to bear on the Transportation Companies here involved by the labor union to force upon the Nebraska carriers a union shop contract, when the labor union was unable under the law to secure recognition by the Nebraska carriers by reason of their employees refusing to accept the labor union as their bargaining agent. The transportation companies more or less went along with this labor union, and did not require their employees to perform the service that these transportation companies were required to render under their certificates of convenience and necessity. They thus find themselves, by reason of their inaction, faced by public demand for additional and other service.

The plaintiffs allege in their complaints that the Commission misconceived the purpose and intention of Congress in Section 207(a) of the Interstate Commerce Act (49 U.S.C.A. § 307(a), which authorizes the grant of motor carrier certificates; that the Commission does not have jurisdiction to deal with labor disputes, or "to remedy alleged problems which arise as a result of labor disputes"; and that Section 212 of the Interstate Commerce Act (49 U.S.C.A. § 312) "is the only remedy provided by said Act for wilful breaches of duty by interstate carriers", and that said Act "does not contemplate or provide for the issuance of certificates of public convenience and necessity as a penalty to existing carriers alleged to have violated their duty to the public".

█ It is true that the Commission does not have jurisdiction to consider the legality or propriety of agreements between motor carriers and labor organizations affecting labor relations between employers and employees, or to adjudicate labor disputes or controversies, but the Commission, under the provisions of the Interstate Commerce Act, is concerned with, and has jurisdiction over, the actions of common carriers in relation to their obligations to the public under that Act. Where, as here, the existing carriers are shown to have so

conducted their operations as to result in serious inadequacies in the service available to a large section of the public, the Commission has both power and duty to authorize such additional motor carrier service as may be necessary to carry out the purposes of the national transportation policy. It is also true that the Interstate Commerce Act does not contemplate or provide for the issuance of certificates of public convenience and necessity as a penalty, but said Act does provide for the issuance of such certificates when the Commission finds that the proposed service is, or will be, required by the present or future public convenience and necessity as set forth in the Act.

The Commission, in its report in the proceeding here under review (79 M.C.C. 599) had this to say on that subject:

"We desire to make it unmistakably clear that we are not attempting to adjudicate any labor dispute or controversy. Agreements between carriers and labor organizations affecting labor relations between employers and their employees are matters which Congress has seen fit to entrust to the supervision of the National Labor Relations Board, and we lack the jurisdiction to consider the legality or propriety of such agreements. We are vitally concerned, however, with the actions of common carriers in relation to their obligations to the public under the terms of the Interstate Commerce Act. The act imposes upon common carriers by motor vehicle subject to our jurisdiction the duty to provide adequate service, equipment, and facilities for the transportation of property in interstate or foreign commerce within the scope of their holding out to the public, and they are obligated to accept and transport all freight offered to them in accordance with the provisions of their certificates of public convenience and necessity and their published tariffs. This duty is almost an absolute one, and, if the public is to be adequately protected, common carriers must be held strictly accountable for its performance. They cannot bargain away their duties and obligations to the public and thereby relieve themselves of such obligations."

■ The plaintiffs and intervening plaintiff contend that instead of seeking motor carrier authority to serve the area involved the aggrieved parties should have filed complaints with the Interstate Commerce Commission or the National Labor Relations Board, and that the grant of a motor carrier certificate to the applicant constituted a penalty upon the plaintiff carriers which the Commission had no legal authority to impose.

These same arguments were made before the Commission in the proceeding under review, but were properly rejected as wholly without merit.

The Commission, in its report of June 1, 1959, in this proceeding (79 M.C.C. 599) fully disposed of these contentions by stating (pp. 612–613):

"In a situation such as that here presented, there arises a question as to the proper procedure to secure corrective action. We do not agree with those of the parties who insist that the procedure here adopted; namely, the filing of the instant applications under the provisions of Section 207 of the Act, is in any manner inappropriate. Regardless of the injection of the labor situation into the matter, the instant applications are based upon claimed deficiencies in the motor service available to the shipping public of Nebraska. Where, as here, the existing carriers are shown to have so conducted their operations as to result in serious inadequacies in the service available to a large section of the public, one effective method of correcting the situation is by the granting of authority for sufficient additional service, and, in fact, we are charged with the duty of procuring such additional facilities as may

be necessary to carry out the purposes of the national transportation policy. The fact that other remedies are available, such as the suggested filing of complaints by the aggrieved carriers and shippers does not alter the situation or deprive any carrier of the right to follow the course here chosen."

■ Section 207 of the Interstate Commerce Act, directs the Commission, in determining applications for motor carrier certificates of public convenience and necessity, to consider both the present and future public convenience and necessity. In hearing and determining such applications, the Commission often finds that coincident with the filing of an application, existing motor carriers start to provide or offer to provide better service to more shippers. Obviously, the Commission is not required to give decisive weight to such a belated zeal to serve the public. Similarly, where existing carriers have gone so far as to subordinate their statutory common carrier service obligations to "hot cargo" clauses, the Commission, in determining the present and future public convenience and necessity, is not required to give controlling weight to a belated cessation of such conduct. It is equally obvious that in determining the public need for service between such major centers as Omaha, on the one hand, and Chicago, St Louis and Kansas City, the fact that some of the existing carriers provided some of the needed service does not preclude authorization of additional service to insure continuous and sufficient service for all shippers.

Congress has provided limited or qualified monopolies for interstate motor common carriers on the theory that ultimately the public will receive more efficient and more economical service. Conversely, Congress did not abandon free entry into interstate motor transportation, with its inherent safeguard of unrestricted competition, merely to protect a few authorized carriers in serving shippers with large amounts of profitable traffic, or, as here, shippers and connecting carriers who have not been "blackballed" by the union with which such carriers have collective bargaining agreements. Congress did not require the Commission to assume that demonstrated recent service inadequacies will not recur; otherwise the belated service zeal of existing carriers could almost always prevent authorization of new and additional service.

It may be that in most cases where there has been a showing that existing motor carrier service has been inadequate, the Commission could proceed to compel the existing carriers to render adequate service to the shipping public. However, Congress has not limited the Commission to such an approach, and, in hundreds of cases, the Commission has responded to a showing of inadequate service by authorizing a new competitive service. The latter approach both conserves the Commission's regulatory resources and utilizes the beneficial forces of competition. We are aware of no basis for precluding the latter approach to the problem of inadequate service to the public where such inadequacy is created by existing carriers subordinating their public service obligations to their collective bargaining agreements.

In support of their position, the plaintiff carriers argue that they were justified in refusing to interchange shipments with other carriers and in refusing to pick up and deliver goods for shippers under the "hot cargo" clauses in their labor contracts. As will be seen from the decisions discussed below there is no merit in this contention.

The Supreme Court in its decision in Local 1976, United Brotherhood of Carpenters and Joiners of America, A.F.L. v. National Labor Relations Board, 357 U.S. 93, 78 S.Ct. 1011, 1021, 2 L.Ed.2d 1186, stated:

"Since the Genuine Parts decision was handed down, the Interstate Commerce Commission has in fact ruled, in Galveston Truck Line Corp. v. Ada Motor Lines, Inc., 73 M.C.C. 617 (Dec. 16, 1957), that the

carriers there involved were not relieved from their obligations under the Interstate Commerce Act by a hot cargo clause.

"It is significant to note the limitations that the Commission was careful to draw about its decision in the Galveston case. It was not concerned to determine, as an abstract matter, the legality of hot cargo clauses, but only to enforce whatever duty was imposed on the carriers by the Interstate Commerce Act and their certificates. The Commission recognized that it had no general authority to police such contracts, and its sole concern was to determine whether a hot cargo provision could be a defense to a charge that the carriers had violated some specific statutory duty. It is the Commission that in the first instance must determine whether, because of certain compelling considerations, a carrier is relieved of its usual statutory duty, and necessarily it makes this determination in the context of the particular situation presented by the case before it. Other agencies of government, in interpreting and administering the provisions of statutes specifically entrusted to them for enforcement, must be cautious not to complicate the Commission's administration of its own act by assuming as a fixed and universal rule what the Commission itself may prefer to develop in a more cautious and pragmatic manner through case-by-case adjudication.

"But it is said that the Board is not enforcing the Interstate Commerce Act or interfering with the Commission's administration of that statute, but simply interpreting the prohibitions of its own statute in a way consistent with the carrier's obligations under the Interstate Commerce Act. Because of that Act a carrier cannot effectively consent not to handle the goods of a shipper. Since he cannot effectively consent, there is, under § 8(b) (4) (A), a 'strike or concerted refusal,' and a 'forcing or requiring' of the carrier to cease handling goods just as much as if no hot cargo clause existed. But the fact that the carrier's consent is not effective to relieve him from certain obligations under the Interstate Commerce Act does not necessarily mean that it is ineffective for all purposes, nor should a determination under one statute be mechanically carried over in the interpretation of another statute involving significantly different considerations and legislative purposes. Whether a carrier has without justification failed to provide reasonable and nondiscriminatory service is a question of defining the carrier's duty in the framework of the national transportation policy. Whether there is a 'strike or concerted refusal,' or a 'forcing or requiring' of an employer to cease handling goods is a matter of the federal policy governing labor relations. The Board is not concerned with whether the carrier has performed its obligations to the shipper, but whether the union has performed its obligation not to induce employees in the manner proscribed by § 8(b) (4) (A). Common factors may emerge in the adjudication of these questions involving independent considerations. This is made clear by a situation in which the carrier has freely agreed with the union to engage in a boycott. He may have failed in his obligations under the Interstate Commerce Act, but there clearly is no violation of § 8(b) (4) (A); there has been no prohibited inducement of employees."

In Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co., D.C., 105 F.Supp. 794, affirmed 8 Cir., 215 F.2d 126, the Court held that the railroad defendant was not relieved of its duty to furnish cars to a shipper because of a strike at the latter's plant. The Court had this to say (105 F.Supp. at page 802):

"The undeniable fact is that the railroad company took no affirmative steps whatsoever to comply with its duty as a common carrier, and did nothing to insist and demand that the strikers should not interfere with the performance of that duty * * * Instead of attempting to obey the law of the land, the defendant assumed to consider the wishes and the demands of the striking Union as being paramount. To condone defendant's failure to perform its statutory duty under this evidence would be tantamount to recognition that mob rule had supplanted law and order in this community.

Other cases to the same effect are Erie Railroad Co. v. Local 1286, D.C., 117 F.Supp. 157; Montgomery Ward & Co. v. Northern Pacific Terminal Co., D.C., 128 F.Supp. 475, 498; Consolidated Freight Lines, Inc. v. Dept. of Public Service, 200 Wash. 659, 94 P.2d 484, 485; Beck & Gregg Hardware Co. v. Cook, 210 Ga. 608, 82 S.E.2d 4; Burlington Transportation Co. et al. v. Hathaway, 234 Iowa 135, 12 N.W.2d 167, 149 A.L.R. 1238.

In Montgomery Ward & Co. v. Northern Pacific Terminal Co., D.C., 128 F. Supp. 475, 498–499, the Court said:

"The labor policy of the United States cannot be conceived to authorize setting aside obligations of others by illegal acts of unions or labor leaders. It cannot authorize violence or threats of violence, picket lines for political purposes, 'secondary' and 'tertiary' boycotts to isolate a single business from the facilities of commerce, or combinations of unions and labor leaders with business concerns such as the railroads and motor truck operators through their respective employees on the ground in line of duty to accomplish any such illegal purposes.

* * * * * *

"The holding out, whether by rail or motor carrier, was not and could not legally be conditioned by any contracts which any of the carriers may have had with its own employees. Working rules or principles within the economy of the carrier would not be permitted to modify its vital obligations. Inadequacy of preparation of any carrier to carry out its engagement for hire made in the public interest might result in the surrender or cancellation of its franchise, but not in a modification of the fundamental duties. Any conditions of this sort would have been illegal.

"The rationale of this claim as to the limitation of the 'holding out' is that the carriers are released from these duties outlined above, since the acts and omissions were those of its own employees over which it had no control because the latter indicated a sympathetic disposition not to handle or transport Wards' shipments. If followed, this theory will revolutionize the present economic structure. A group of transportation employees can bring all the rail and motor systems to a standstill by refusing to transport articles destined for another country with which the group disagrees. The same ends can be obtained by a picket line dedicated to that end, which transportation workers will not cross. These are not theories, but pragmatic present day problems. Foreign policy, governmental action, political action and the extinction of private business can be controlled by collusive interaction of employees of carriers with outside and unconnected organizations.

"The contention, if adopted, would destroy the representation of the employer by his employees dealing with the public or individuals in another line of business. It would wipe out the corporate theory."

The Court, recognizing that its earlier opinion in the Montgomery Ward case (128 F.Supp. 475) had been subject "to much interpretation", rendered in a clarifying opinion, stated (128 F.Supp. 520):

"The opinion, reduced to its lowest terms, held that each common carrier, whether trucker or railroad, has a duty at common law and under the Interstate Commerce Act, 49 U.S.C.A. 1 et seq., to receive, transport and deliver goods in accordance with its holding out or the engagement of its posted tariff. This duty is almost absolute, since the carrier is excused only if performance is prevented by the act of God or the public enemy. Because neither of these defenses was established, liability was found as to each defendant as to specific goods."

 It is clear, we think, from the foregoing decisions that labor disappointments such as those present here, do not constitute a valid excuse for motor carriers to refuse to pick up and deliver shipments tendered to them by shippers which are experiencing labor troubles and whose plants are picketed, or to refuse to interchange shipments with other carriers which are not unionized or are not engaged in labor controversies with their employees.

When existing motor carriers fail for any of these reasons to perform their duties and obligations to shippers and other carriers, the Commission is empowered and required to insure adequate motor carrier service through the authorization of additional and appropriate motor carrier certificates of public convenience and necessity, as was done here.

 The plaintiffs and plaintiff interveners seek to have this Court set aside the Commission's order granting motor carrier authority to the applicant on the grounds that the plaintiff carriers have now resumed the motor carrier service which they discontinued in deference to union contracts and pressures, and that Congress subsequently passed the Labor-Management Reporting and Disclosure Act of 1959, commonly referred to as the Landrum-Griffin bill, Section 703 of which undertakes to outlaw "hot cargo" clauses. They contend that these developments render the issues moot.

With respect to the first contention, the Commission in its report of June 1, 1959, in the instant proceeding found (79 M.C.C. 599, 613) that the labor difficulties in question "were continuing to be experienced up to and including the time of the hearing." Moreover, in other proceedings where the labor difficulties under consideration had actually ceased at the time of the hearing, the Commission held that the issues were not moot. Planters Nut & Chocolate Co. v. American Transfer Co., 31 M.C.C. 719; Montgomery Ward & Co., Inc. v. Santa Fe Trail Transportation Co., 42 M.C.C. 212; and Galveston Truck Line Corporation v. Ada Motor Lines, Inc., et al., 73 M.C.C. 617. The Commission's conclusions in this regard are supported by numerous court decisions.

In Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, at pages 515–516, 31 S.Ct. 279, at page 283, 55 L.Ed. 310, in which it was contended that the issues involving an order of the Commission were moot, the Court said:

"* * * The question[s] involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar), and [their] considerations ought not to be, as they might be, defeated, by short-term orders, capable of repetition, yet evading review, and at one time the government, and at another time the carriers, have their rights determined by the Commission without a chance of redress.

"In United States v. Trans-Missouri Freight Association, 166 U.S. 290, 308 [17 S.Ct. 540, 41 L.Ed. 1007], the object of the suit was to obtain the judgment of the court on the legality of an agreement between the railroads, alleged to be in violation of the Sherman law. In the case at bar the object of the suit is to have declared illegal an order of the Interstate Commerce Commission. In that case there was an attempt to defeat the purposes of the suit by a

voluntary dissolution of the agreement, and of the attempt the court said: '* * * Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action. Here, however, there has been no extinguishment of the rights (whatever they are) of the public, the enforcement of which the Government has endeavored to procure by the judgment of a court under the provisions of the act of Congress above cited. The defendants cannot foreclose those rights nor prevent the assertion thereof by the Government as a substantial trustee for the public under the act of Congress, by any such action as has been taken in this case.' * * * "

Also see Van De Vegt v. Board of Commissioners, 98 Colo. 161, 55 P.2d 703, 710, and United States v. Aluminum Company of America, 2 Cir., 148 F.2d 416, 448.

In Walling v. Haile Gold Mines, Inc., 4 Cir., 136 F.2d 102, 105, the Court, in rejecting an argument of mootness, said:

"It is familiar law that the discontinuation of an illegal practice by a defendant (either by going out of business or otherise) after the institution of legal proceedings against the defendant by a public agency, does not render the controversy moot. * * * This particularly is true where the challenged practices are capable of repetition. * * * Nor is a case rendered moot where there is a need for the determination of a question of law to serve as a guide to the public agency which may be called upon to act again in the same matter * * *."

In their second argument, the plaintiffs and intervening plaintiffs, in their respective briefs, contend that the passage of the Landrum-Griffin Labor Reform Act, which purports in Section 703 thereof to outlaw "hot cargo" clauses in labor contracts, rendered moot the questions presented by the instant application, and that therefore the Commission's order granting the application should be set aside.

So far as we are aware there has been no court determination, whether or not the act just referred to effectively outlaws "hot cargo" clauses, and many months or years may pass before there is a judicial interpretation of this act. Even if an affirmative determination had been made, we maintain that the enactment of that legislation constitutes no basis for the voidance of the Commission's order granting the motor carrier authority in question.

There is no assurance, therefore, that the public will be protected against future cessations of motor carrier service resulting from labor difficulties such as are present here.

But completely apart from the question as to whether or not the Labor Management Reporting and Disclosure Act of 1959 effectively prohibits the type of concerted union activity which resulted here in the public being deprived of adequate transportation service, the fact remains that the record in this case establishes that some of the plaintiff carriers have elected to ignore their obligations as common carriers and their duties under the Interstate Commerce Act until after the present application was filed. In view of this conduct on the part of these carriers, the Commission was surely justified in issuing an additional common carrier certificate so as to insure that the public will not in the future have to again suffer from inadequate transportation service in this area.

The Commission is not concerned with the contents of the contracts which the carriers have with the labor unions, but the Commission is concerned with the conduct of the carriers in serving the public, without regard to those contracts.

The intervening Union argues that granting a certificate of convenience to applicant on the basis of the non-union character of applicant and on the basis of secondary boycott activity by a union injects the Commission into the area of

labor relations and collective bargaining. In answer to that the Commission says that under its jurisdiction, it cannot consider whether the applicant is union or non-union; that it has no power to regulate employer or employee labor matters; that Congress has vested the power to act in such matters with the National Labor Relations Board; and that its power to act under the circumstances of this case comes from the Statute of its creation which imposes a duty to see that common carrier service is rendered to the public; and that whenever there is a failure to render the service for any reason, except an Act of God, or by the public enemy, that it can act to remedy the matter by granting authority such as granted in this case. In answer to the boycott theory, it is sufficient to say that the Courts have held that such provisions in a labor contract are illegal and that Congress has now so determined. The further answer to its theory is that this record, under the facts established, shows no labor dispute between applicant and its employees, or any labor dispute that has not been corrected between the stockholder carriers and their employees. It does show an unsuccessful attempt on the part of the Union to organize the employees of stockholder carriers and that by its failure to so do it has effectively destroyed any jurisdiction of the National Labor Relations Board under the Act of its creation.

The facts as hereinabove set out, and the law as herein announced, are hereby adopted as the findings of fact and conclusions of law.

It is therefore ordered, adjudged and decreed that the order of the Commission be, and the same is hereby affirmed, and it is further ordered, adjudged and decreed that the complaint of plaintiff, and the complaints of intervening plaintiffs be, and the same are hereby dismissed for want of equity.

MAJOR, Circuit Judge, concurs in the foregoing opinion of POOS, District Judge.

MERCER, Chief Judge (dissenting).

I cannot agree with the decision of the majority of the court and I therefore dissent. I would hold that the order of the Commission granting the certificate of public convenience and necessity to Short Line [1] was entered in violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and that the order is therefore null and void.

Contrary to the suggestion of the majority opinion, we are not concerned with the validity of the basic, or evidentiary, findings of fact of the Commission. Plaintiff does not challenge the evidentiary findings and the Commission and the United States are without standing to challenge the validity of their own findings. To some extent, Short Line, as an intervening defendant, has attempted to raise that issue. As a party intervener on the Commission's side of the case, Short Line is in the same boat with the Commission and must sink or swim upon the strength of the findings as they are found and incorporated in the Commission's report.

Two issues are decisive of the case at bar, namely, whether the evidentiary findings of fact of the Commission support its ultimate finding of public convenience and necessity which forms the predicative basis for the Commission order, and, whether the Commission, in entering the order in question, exceeded the power and jurisdiction conferred upon it by Section 207 of the Interstate Commerce Act, 49 U.S.C.A. § 307. In my opinion, the order must fall on each basis.

Beyond cavil, the Commission was not bound by the findings of fact of the examiner, whether evidentiary or ultimate, but it did adopt the evidentiary findings of its hearing examiner in this case. Disagreement with its hearing examiner is limited solely to a determination that the ultimate finding and conclusion by the examiner that public convenience and necessity had not been proved was erroneous. Granted that on a mere question of naked power the Commission did have

[1]. Nebraska Short Line Carriers, Inc.

authority to adopt an ultimate finding directly opposed to that recommended by its hearing examiner, but that naked authority is tempered by the legal requirement that the ultimate findings adopted by the Commission be supported by its own evidentiary findings of fact. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 533, 66 S.Ct. 687, 90 L.Ed. 821; I. C. C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051; Southern Kansas Greyhound Lines v. United States, D.C. Mo., 134 F.Supp. 502, affirmed 351 U.S. 921, 76 S.Ct. 779, 100 L.Ed. 1453; Seaboard Air Line Railroad Co. v. United States, D.C.Va., 131 F.Supp. 129, affirmed 349 U.S. 902, 75 S.Ct. 579, 99 L.Ed. 1239; Schaffer v. United States, D.C.S.D., 139 F.Supp. 444, reversed on other grounds, Schaffer Transfer Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117.

This case arises out of a rather simple situation as the following summary of the findings of the Commission reveal. Its apparent complexity follows from the emotional overtones inherent in the perusal of the seeming overbearing attitude of a labor union in its attempt to enforce its will upon the stockholders of Short Line.

Short Line is a corporation organized by a number of eastern Nebraska carriers who own all of its capital stock.[2] Those carriers are hereinafter sometimes referred to as the stockholders carriers and, individually, as Romans, Clark, Lyon, Mc-Kay, Winter, Abler, Peters, Superior, Pawnee, Derickson, Steffy, Wilber and Tillman.

All of the stockholder carriers operate principally between points in the State of Nebraska. All are non-union. Each of them handles both local freight and interstate freight. Each maintains interchange points, principally within Nebraska, for the interchange of interstate freight with line-haul certificated interstate motor carriers. Interstate freight interchange was, from time to time, made with plaintiff, Burlington, the intervening plaintiff-carriers[3] and other line-haul carriers. Hereinafter, for convenience, Burlington and the intervening plaintiff-carriers are referred to as plaintiffs, except as the context otherwise requires. Individually, the intervening plaintiff carriers are referred to as Santa Fe, Watson, Red Ball, I.M.F., Independent, Illinois, I.M.L., Navajo and Ringsby, respectively, in the order in which they are listed in footnote 3.

All of the plaintiffs are union carriers, and each has a collective bargaining agreement with the Teamsters Union. At all times material to this case, each of the union contracts contained a so-called hot-cargo clause which provided that the carrier would not discharge or discipline any employee who refused to cross a picket line or who refused to handle hot-cargo, i. e., freight produced or tendered by any person who was engaged in any labor dispute with the Teamsters or other labor union.

2. These stockholder carriers are John Romans, doing business as Romans Motor Freight, Fred L. Clark and Walter F. Clark, doing business as Clark Bros. Transfer, Royal F. Lyon, doing business as Lyon Transfer, C. C. McKay and Earl R. McKay, doing business as McKay Freight Line, Waldo W. Winter and Hubert B. Winter, doing business as Winter Bros., Abler Transfer, Inc., Herbert Peters, doing business as Fremont Express Co., Henry G. Frear, doing business as (1) Superior Transfer and (2) Pawnee Transfer, John Derickson, doing business as Derickson Transfer, Lewis Steffens-meir and Edward Steffensmeir, doing business as Steffys Transfer, Norman J. Rezny and Norman B. Slepica, doing business as Crete and Wilber Freight Lines, and Harvey Tillman, doing business as Tillman Transfer Co.

3. Santa Fe Trail Transportation Company, Watson Bros. Transportation Co., Inc., Red Ball Transfer Co., Interstate Motor Freight System, Inc., Independent Truckers, Inc., Illinois-California Express, Inc., Interstate Motor Lines, Navajo Freight Lines, Inc., and Ringsby Truck Lines, Inc.

Beginning in 1955, the intervening plaintiff, Local 554 [4] began a drive to organize common carrier employees in the eastern part of the State of Nebraska. The attempt was made to organize a part of the stockholder carriers from the top down, i. e., by persuading the carrier to enter into a union shop agreement with Local 554 under which its employees would be required to become union members. When the union drive failed, normal freight interchange with a part of the stockholder carriers was interrupted. The affected stockholder carriers experienced refusal by certain of the interstate motor carriers, who were a party to the hot-cargo agreements, to pick up freight shipped over the stockholders' lines from points in Nebraska and destined for interstate points outside that State. Some shipments into Nebraska which were routed by the consignee for terminal delivery by the stockholder carriers were diverted from that routing for terminal delivery by other motor carriers or by rail. In many instances delays were experienced by shippers in delivery of goods shipped interstate by them and routed by motor carrier, and in the receipt of merchandise ordered by them for interstate shipment and delivery by motor carrier. Thus, it appears, from the evidence, and the Commission found that Romans, Abler, McKay, Peters, Lyon and Clark experienced a breakdown of interchange of freight and accompanying difficulties to varying degrees. On the other hand, neither Wilber, Tillman, Derickson, Steffy, Winter, Superior nor Pawnee ever experienced any breakdown or interruption of freight interchange.

As a result of the activities of Local 554 and the ensuing interchange interruption experienced by a part of their number, the stockholder carriers incorporated Short Line as an interstate motor carrier. The application for a certificate of public convenience and necessity was then processed with the Commission, seeking authority for Short Line to operate as an interstate carrier of general commodities, with exceptions, over regular routes between Omaha and Lincoln, Nebraska, on the one hand, and major mid-west cities and Denver, Colorado, on the other.

The examiner found that the routes designated in the Short Line application were served by other certificated interstate carriers, including the plaintiffs. He also found that the equipment of plaintiffs and other carriers whose routes duplicated those requested by Short Line in its application, was not being operated to capacity and that such carriers could handle additional interstate traffic whenever the same was available. In addition to the large number of certificated motor carriers who serve the points along the routes designated in the Short Line application, the affected area is served by either the Chicago, Rock Island & Pacific Railroad, the Chicago & North Western Railway, the Chicago, Burlington & Quincy Railroad, the Missouri Pacific Railroad or the Union Pacific Railroad. Each of the named railroads appeared in opposition to the application, and each was, as the master found, able and willing to handle less than car load shipments destined for a part of the Nebraska communities included within the area served by the stockholder carriers. In this connection, also, the examiner found that Burlington and Santa Fe were continuing to interchange freight normally with the stockholder carriers at Omaha and Lincoln on all interstate shipments originating at or destined for delivery to Nebraska points. Interchange was being effected by the affected stockholder carriers with National [5], Ringsby, Rock Island [6], Bos [7], D.M.T. [8], and Merchants [9].

---

4. General Drivers and Helpers Union, Local 554, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

5. National Carloading Company.

6. Rock Island Motor Transit Co.

7. Bos Truck Lines.

8. Des Moines Transportation Company, Inc.

9. Merchants Motor Freight, Inc.

The examiner summarized his evidentiary findings on the latter phase of the case in the following language:

"As indicated, applicant relies heavily on the claim that the existing line-haul motor carriers have refused to interchange with stockholders named therein. There is no evidence, however, showing that Derickson, Frear (who operates Pawnee Transfer and Superior Transfer), Steffy, Tillman, Wilber and Winter have had any particular trouble in interchanging shipments with connecting lines, and Peters was still interchanging shipments with a considerable number of line-haul motor carriers. In any event, most of Peters' interchange at Omaha is effected with National Carloading. As to Abler and McKay, they were still interchanging traffic with Burlington, Ringsby and Santa Fe Trail, and Romans was still able to conduct interchange with Burlington, Ringsby, Rock Island and Santa Fe Trail. Lyon was still interchanging traffic with Burlington at Lincoln, and at Omaha with Bos, Burlington, Ringsby, D.M.T. and Merchants. As to Clark, the evidence shows Sante Fe Trail has continued to interchange traffic and in most instances this stockholder had been able to find a motor carrier willing to accept interstate shipments.

"Although the shipper evidence relating to interior Nebraska points indicates that there have been some delays in transit, principally because shipments had been diverted to carriers other than those designated by the consignees, the shipments had been moving through to destination."

Again the examiner found as follows:

"On the question of whether a grant of the authority sought would endanger or impair the operations of existing carriers contrary to the public interest, it cannot be said that protestants and other unionized carriers are not now enjoying the traffic over their respective portions of the routes involved and the shipments are moving through to destination."

Upon the basis of his evidentiary findings as above summarized, the examiner found and concluded that Short Line had failed to establish that the interstate operation which it proposed was required by the present or future public convenience and necessity. The examiner concluded that Short Line's application should be denied.

The Commission adopted the findings of the examiner, including the findings that Burlington, Santa Fe and other motor carriers were continuing normal interchange with the stockholder carriers, that the line-haul motor carriers operated over the routes proposed by Short Line and that their equipment was not used to capacity, that the line-haul carriers were enjoying the freight proposed to be handled by Short Line and that freight shipments destined to and from eastern Nebraska points were moving through to their consignment destinations.

Rather than disturbing the findings of the examiner indicative that the equipment and facilities of the certificated line-haul carriers were adequate to serve the routes sought by the Short Line application, the Commission reasoned that public convenience and necessity required allowance of the application because the breakdown of normal interchange relations with a part of the stockholder carriers constituted an abrogation by a part of the line-haul carriers of their duty to the shipping public which their certificates required. Thus, the Commission recognized that the disruption of normal interchange of freight with some of the stockholder carriers resulted from a labor dispute between such stockholder carriers and Local 554. Although the Commission did not purport to decide the merits of that labor dispute, it reasoned that the certificated union carriers could not bargain away their duty to serve the public by an agreement with a labor union and thus relieve themselves of their obligations to the public as common carriers.

The Commission concluded that certain of the line-haul carriers had, in reliance upon the "hot-cargo" clause of their contracts with the Teamsters Union, violated their duty as common carriers to serve the public, and that that violation had created a deficiency in motor service available to Nebraska shippers. Because of that deficiency, the Commission found that the present and future public convenience and necessity required that the Short Line application be allowed. An order was entered accordingly.

I would hold that the order be set aside for the reason that the finding of public convenience and necessity is contrary to the evidentiary findings of the Commission upon which that ultimate finding is based. Upon every application for authority to operate as a common carrier by motor vehicle between interstate points, the Commission must determine the adequacy of the facilities of existing carriers as a preface to its decision. In Filson v. I.C.C., D.C.Colo., 182 F.Supp. 675, 676, the court said that "an inadequacy of existing facilities is a basic ingredient" for the determination of the existence of public necessity on a carrier certificate application. In Hudson Transit Lines v. United States, D.C.S.D.N.Y., 82 F.Supp. 153, affirmed 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485, the court held that a finding of the inadequacy of existing facilities is essential to support a finding of the Commission of public convenience and necessity for the grant of a competing carrier application. To the same effect are Schaffer v. United States, D.C.S.D., 139 F.Supp. 444, reversed on other grounds Schaffer Transfer Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed. 2d 117; Associated Transports, Inc., v. United States, D.C.Mo., 169 F.Supp. 769; Inland Motor Freight v. United States, D.C.Wash., 60 F.Supp. 520; McLean Trucking Co. v. United States, D.C.N.C., 63 F.Supp. 829. In reversing the Schaffer case, the Supreme Court said that the relative adequacy of existing service is a significant consideration when interests of competition between carriers are being reconciled with the policy of maintaining an over-all sound system of transportation.

In United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38, the court stressed the Commission's findings of inadequacy of existing facilities in reversing a decision setting aside a Commission order granting new operating rights. The application for proposed carriage by water of automobiles from Detroit, Michigan, to other Great Lakes ports was opposed by the Navigation Company which had been previously certified to serve the same ports. The Commission had found that the service by the Navigation Company had been inadequate in peak season because of a shortage of available ships, that most of the Navigation Company's ships were, at the time of the application, in the service of the United States as a result of World War II and that post-war production of cars would far exceed the pre-war volume which the Navigation Company had carried, which would in turn, require added facilities. Those findings were stressed by the Court as support for the Commission's order certificating additional service in competition with the protestant.

In Norfolk Southern Bus Corp. v. United States, D.C.Va., 96 F.Supp. 756, affirmed 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590, the court did say that it was not necessary for the Commission to specifically find that existing service was inadequate before granting a certificate for additional bus service, but that statement must be viewed against the background of the evidence in that case indicating that the service and facilities of existing carriers were inadequate.

We are not here confronted with a mere failure to find, expressly, that the existing carrier facilities and service capabilities are inadequate. What we are confronted with are findings of fact adopted by the Commission which lead to only one conclusion, namely, that existing carrier facilities and service capabilities are adequate. In my opinion, the ultimate finding of public convenience and necessity for granting the Short Line

operating rights is diametrically opposed to those basic findings of fact.

It is no answer to say that existing carriers do not have an absolute monopoly with respect to the routes defined in their respective certificates. Neither, in my opinion, is the fatal defect in the predicative basis of the Commission's order overcome by anything expressed in the National Transportation Policy. The Transportation Policy merely expresses congressional intent that the Commission shall have authority to maintain an integrated system of interstate transportation by balancing the competitive rights of rail, water and motor carrier facilities to fulfill the transportation needs of the public. Both the Policy and Interstate Commerce Act contemplate the granting of limited monopolies. While a carrier may not cite its certificate as a monopoly grant foreclosing the grant of competing rights, it may cite its certificate, in conjunction with evidence of its ability to render adequate service to the shipping public, as persuasive evidence against an application for competing carrier service.

Monopoly grants are tolerated to avoid ruinous competition and unnecessary duplication of service. I would hold that the monopoly rights previously granted to plaintiffs and other interstate carriers are vested rights to the extent that those rights ought not to be ousted or diluted, except upon a finding of inadequacy of existing facilities and of a demonstrated need for competing service as an integral part of a national system of transportation.

I would declare the order under review null and void for the reason that the finding of public convenience and necessity is not supported by the Commission's basic findings of fact.

The more serious aspect of this case, and an issue equally fatal, in my opinion, to the Commission's order, is the question of the jurisdiction of the Commission to enter the order under review. Upon review of the whole case I am convinced that the Commission employed the certification procedures of Section 207 of the Act, for a purpose and in a manner for which the statute was never intended. The hard core of this whole case is one fact, namely, the existence of a labor dispute between Local 544 and certain of the stockholder carriers. Any doubt as to the large effect of that fact is dispelled by reading the Commission's report. Most significant, I think, is the fact that the Commission found it necessary to devote paragraph after paragraph and several pages of its report to a discussion of the labor aspects of the case and to an explanation that it was not deciding that labor issue. In like manner, in approaching the conclusion that the order of the Commission is valid, the majority of the court devotes some 15 typewritten pages of opinion to the labor aspects of the case, to the duty of a common carrier to the public despite labor involvement and to a discussion of the lack of any decision on a labor dispute in the Commission's disposition of this case.

Moving out from the hard core of the existence of a labor dispute, the Commission concluded that plaintiff carriers, notwithstanding their union contract and possible labor involvement, owe a duty to the public which they should not shirk. Upon that conclusion is then erected a finding that some, but not all, of the certificated interstate motor carriers breached that duty which they owed to the public by creating a disruption of normal interchange of freight and, thereby, a deficiency in motor freight service to shippers in a part of Nebraska. Upon the verdict of the guilt of a part of the interstate motor carriers hangs the finding and conclusion that public convenience and necessity requires the certification of Short Line as an additional interstate carrier to compete with plaintiffs, both the guilty and the innocent, and to compete with the rail facilities which already exist and serve the interstate needs of Nebraska shippers.

I find the suggestion that Burlington, Santa Fe, and the other interstate carriers who continued normal interchange with the stockholder carriers are not af-

fected or injured by the order to be a completely unrealistic concept. As I have previously pointed out the Commission found that these carriers were operating at less than maximum capacity for their equipment and facilities, and that they, along with the other interstate motor carriers had been enjoying the traffic which Short Line sought by its application. The order deprives the guilty and the innocent alike of traffic which they otherwise would enjoy.

I think the evil of the order lies in a simple but very significant fact which both the Commission and the majority of this court overlook, namely, that the basic findings of the Commission's report and the evidence adduced before the hearing examiner are geared to the complaint procedures established by Section 212 of the Act, 49 U.S.C.A. § 312, not to the procedure contemplated by the express provisions of Section 207.

The evidence adduced before the examiner tended to prove that some, but not all, of the plaintiffs and other interstate carriers had refused to conduct normal interchange of freight destined to and from destinations within the eastern part of Nebraska. Upon that evidence the Commission rendered its verdict of guilt, making no distinction between the guilty, the semi-guilty, and the innocent. The evidence as to the effect of the disruption of normal interchange by some of the line-haul carriers tended to prove that some, but not all, of the stockholder carriers had lost business and revenue because of the decrease of interstate freight. The shipper evidence supports the finding that some shippers in the area served by the stockholder carriers had incurred increased freight charges and less efficient motor freight service as a result of disruption of normal interchange. Again, the Commission's report makes no distinction between the injured and the uninjured.

The effect of the Commission's order is a *carte blanche* decision that all interstate motor carriers operating through the interchange points used for eastern Nebraska freight are guilty, either actually or vicariously, of a breach of duty owed to the public under their operating certificates for which they would be punished by granting the Short Line application. The benefits of the granting of that application accrue not only to the stockholder carriers who were found to have been injured by the disruption of normal interchange, but, also, to the stockholder carriers who had not been injured and who, under the expressed finding of the Commission, had no complaint against the interstate carriers.

No case is cited by the Commission or by the majority of this court, and no case has been found, in which the certification procedure of Section 207 has been employed in this fashion. Cases upon which the Commission relies and which are cited by the majority of this court involved either a complaint proceeding or a civil action for injunctive relief or for damages resulting from the failure of a carrier to render service commensurate with the obligations imposed by its status as a common carrier. E. g., Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry. Co., D.C.Minn., 105 F.Supp. 794, affirmed as modified 8 Cir., 215 F.2d 126; Montgomery Ward & Co. v. Northern Pacific Terminal Co., D.C.Or., 128 F.Supp. 475.

The Commission does have the authority under Section 212 of the Act, upon any complaint, after notice and a hearing, to compel a carrier to comply with the Act and with the duties and obligations imposed by its certificate of public convenience and necessity. E. g., Montgomery Ward & Company v. Santa Fe Trail Transportation Co., 46 M.C.C. 212; Planters Nut & Chocolate Co. v. American Transfer Company, 31 M.C.C. 719. Section 212 vests the Commission with a wide discretion to penalize violations of the Act and breaches of duty to the shipping public, which includes the suspension or revocation of a certificate previously granted.

The shipper or carrier injured by a violation of the Act by any carrier, or by a breach of the duties and obligations owed by a common carrier to the shipping public may prosecute an action for dam-

ages, e.g., Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry. Co., supra, Montgomery Ward & Co. v. Northern Pacific Terminal Co., supra, or a suit to enjoin continuing unlawful conduct. E.g., Quaker City Motor Parts Co. v. Interstate Motor Freight System, D.C.Pa., 148 F. Supp. 226.

Either a complaint proceeding or a civil action for damages or injunction apparently would be appropriate in this case. As the examiner pointed out in his report, the evidence adduced in this case is geared to the complaint situation, not to the customary certification proceeding under Section 207.

The distinction between a Section 212 proceeding and a civil action for relief, on the one hand, and Section 207 proceeding on the other, is too significant to lightly permit the latter to be used by a disgruntled carrier indiscriminately as an equivalent substitute for the former. The Section 207 proceeding is an *ex parte* proceeding, although opponents of an application may appear and resist it. On the other hand, a Section 212 proceeding is an adversary action commenced by a complaint which must specify charges of some illegal action or breach of duty by a named carrier or carriers. As in litigation before the courts, the issues are squarely drawn. Due notice of the complaint and a full opportunity to appear and defend are the minimum requisites for a valid decision of the issues by the Commission. The initial burden of proof is on the complainant.

By contrast, the proceedings before the Commission in this case evince a serious, and I think unwarranted and unlawful, extension of the certification authority granted by Section 207. Here, an *ex parte* application was filed. Upon the hearing upon that application, by evidence adduced, both those stockholder carriers who claimed injury and those who, presumably, felt they might be injured in the future, converted the application into a broad charge of misconduct on the part of the line-haul carriers. I find that approach frightening enough when the question of adequacy of notice, alone, is considered. It becomes even more frightening when the evidence of misconduct of some of the line-haul carriers is made to attach vicariously and detrimentally to those carriers who conducted normal interchange.

While it cannot be doubted that the Commission does possess a large discretion to frame its decisions in a manner calculated by it to implement the provisions of the Act, that discretion does not extend to the creation of a new penalty which is not expressly provided by the Act and which the framers of the Act never contemplated. In my opinion, that is what the Commission has done in this case, and its order should not be permitted to stand and become a very dangerous precedent.

Here, the Commission conceded that it was without authority to decide the merits of the dispute between Local 554 and a part of the stockholder carriers and to determine the validity of the "hot-cargo" clause. Yet it took the position that it could, nevertheless, find that a breach of duty had been perpetrated as a result of those labor questions by a part of the line-haul carriers serving eastern Nebraska, and, upon that finding, penalize all carriers in that classification by the grant of competing operating rights to Short Line. That is, I think, the crux of the true impact of the labor aspects on this case—they furnished an opportunity for the Commission to assert an authority beyond that granted by the Act.

The old axiom that "the hit dog howls" should be made to apply to this case. If Clark and others have a complaint against some or all of the line-haul carriers, they alone should do the howling. Section 212 of the Act provides them the opportunity to assert that complaint before the Commission and invoke a jurisdiction under which the issues could be decided in an appropriate proceeding. At least, until the complaint procedure has been tested, we should not permit the whole pack to come in asserting that

some have been hit and claiming a right, on behalf of the pack, to a remedy which the Act was never intended to provide.

I would declare the Commission's order null and void.